LONG ISLAND RAIL ROAD COMPANY, Petitioner, v LONG ISLAND LIGHTING COMPANY, Respondent.

Second Department, August 20, 1984

### APPEARANCES OF COUNSEL

*Thomas M. Taranto* (*Roger J. Schiera, Dolores D. Walker* and *Sharon D. Patterson* of counsel), for petitioner.

*Shea & Gould* (*Michael Lesch, Ronald D. Lefton* and *David H. Pikus* of counsel), for respondent.

### OPINION OF THE COURT

NIEHOFF, J.

The Long Island Rail Road Company (the LIRR), as petitioner, brings this proceeding pursuant to EDPL 207 to review the determination and findings of the respondent Long Island Lighting Company (LILCO), dated May 3, 1983, to acquire certain easements in real property and

rights of way owned by the LIRR. In substance the LIRR contends that (1) LILCO has no statutory authority to condemn property of the LIRR because it is a political subdivision of the State of New York, (2) even if statutory authority exists to empower LILCO to condemn property owned by the LIRR, that authority does not extend to the property interests at bar which are acknowledged to be devoted to a prior public use, and (3) in any event, LILCO cannot exercise the power of eminent domain in this case because the presence of LILCO's facilities on the railroad rights of way will cause substantial interference with the LIRR's operations. On the strength of those arguments the LIRR asks that LILCO's determination and findings be set aside. For the reasons hereinafter set forth, we reject the LIRR's contentions and confirm the subject determination and findings.

### THE FACTS

Briefly stated, the facts, which are mainly undisputed, are as follows:

The petitioner LIRR is a public benefit corporation of the State of New York and a wholly owned subsidiary of the Metropolitan Transportation Authority. It derives its powers from various provisions of the Public Authorities Law. The respondent LILCO is a gas and electric corporation and the principal supplier of gas and electricity to the public in Nassau and Suffolk Counties. Both LILCO, as a gas and electric corporation, and the LIRR, as a public benefit corporation, have certain powers of eminent domain.

The LIRR has extensive rights of way throughout Long Island, upon which it has placed its railroad tracks. LILCO has used some of these same rights of way for placement of poles carrying overhead lines and conduits carrying underground lines.

LILCO's use of the LIRR's rights of way has been governed by two "occupation agreements" (one for Nassau County and one for Suffolk County). These agreements, executed in 1952 and 1957, respectively, and made retroactive to 1950, originally provided that the LIRR was to be compensated at an annual rate of $500 per mile for single-circuit occupancy, and $750 per mile for multiple-circuit

occupancy. In addition to setting forth the rate of compensation, the occupation agreements also imposed numerous obligations on LILCO in constructing and maintaining its lines. For example, LILCO was obligated to inform the LIRR of any activity concerning the licenses granted by the occupation agreements and receive approval from the LIRR, to pay for any safety measures provided by the LIRR, to indemnify the LIRR, etc. These agreements were amended frequently during the years and the rates of compensation were raised to $600 and $900 per mile, respectively.

From time to time after the execution of the occupation agreements, LILCO requested permission to use additional rights of way for which the parties have negotiated different, higher rates than those provided for in the occupation agreements as amended. Two of these additional and more expensive licenses, namely, the West Hempstead license and the Oyster Bay license, are the subject matter of this proceeding.

The West Hempstead license is described as: "A corridor for a 13 KV underground distribution line which runs for approximately 520 feet from LILCO's West Hempstead substation, crosses perpendicularly underneath the LIRR tracks (Valley Stream Branch), and continues underneath an unused, untracked LIRR freight yard before exiting LIRR property at Hempstead Avenue." This license was granted by letter agreement dated November 11, 1968. The agreement was to be effective "[p]ending the preparation and execution of a formal license agreement", but no such formal agreement was ever executed. Nevertheless, the letter agreement provided that the annual rate of compensation for this license was to be, at minimum, $2,800, and further stated that "[i]t is contemplated that [LILCO] will be granted a twenty-year license, with a twenty year [sic] renewal option and [that the rate of compensation will be] subject to renegotiation at the end of every five year [sic] period".

The Oyster Bay license is described as: "A corridor for a 69 KV overhead transmission line which runs for approximately 2.5 miles along LIRR's Oyster Bay branch tracks from LILCO's Oyster Bay substation to LILCO's Locust

Valley substation." With respect to this license, a supplement to the occupation agreement covering Nassau County was executed on or about August 8, 1969. It provided, among other things, that the annual rate of compensation was to be figured at $1,500 per mile and that: "inasmuch as the changes covered by this Supplemental Agreement involve a large additional financial investment on the part of the Power Company, the Railroad Company is willing and does hereby agree * * * that * * * the term of such agreement * * * shall be for a period of twenty (20) years from the date hereof". However, the terms of compensation were made "subject to renegotiation at the end of every five-year period". The transmission lines on the West Hempstead license serve about 7,920 customers and would cost LILCO about $240,000 to remove and relocate. The Oyster Bay license serves approximately 12,305 customers and removal and relocation costs would run about $3,900,000.

Starting in 1973, petitioner, the LIRR, sought to negotiate increased rates, demanding that the rates under the two occupation agreements be raised substantially. That proposal was not acceptable to LILCO, and the negotiations which would continue for nearly the next decade were underway.

By letter dated January 30, 1974, the LIRR informed LILCO that the West Hempstead license expired as of January 25, 1974, noting that the November 11, 1968 letter agreement had been, at most, "only a five-year license agreement terminating no later than January 25, 1974, since it provided no formula or means of ascertaining the fee to be paid after the first five years". Nevertheless, the LIRR stated that it would be willing to continue LILCO's present occupancy of that license pending compensation negotiations, provided that any final agreement on rates would be retroactive to January 1, 1974 and provided further that the LIRR retained the right to terminate the revocable license on 24 hours' notice.

In July, 1974, the LIRR notified LILCO that it was canceling the Nassau and Suffolk occupation agreements on the ground that they, too, were only agreements to agree, and were no longer enforceable. Then, in early August, 1974, the LIRR sent LILCO a similar letter with respect to the Oyster Bay license.

Thereafter, numerous attempts to resolve the dispute took place. While both sides recite different histories of the negotiations, one thing is abundantly clear, and that is that the parties could not arrive at a mutually satisfactory rate of compensation for the licenses. As a result, by letter dated June 25, 1982, the LIRR terminated the negotiations, and in July and August of 1982, the LIRR canceled the West Hempstead and Oyster Bay licenses, and directed that LILCO remove its facilities. The LIRR then commenced an action in ejectment in the Supreme Court, Nassau County. LILCO moved to dismiss the ejectment action and commenced condemnation proceedings.

At the first public hearing held on October 13, 1982, only the LIRR and LILCO appeared. LILCO presented a number of documents and the hearing was adjourned to give the LIRR the opportunity to submit documents of its own. On October 26, 1982 the hearing reconvened, at which time the LIRR's evidence was submitted. The hearing was continued to March 21, 1983 when both parties submitted further documents. During the course of the hearing, on October 26, 1982, the representative of the LIRR stated that he did not believe that LILCO had any statutory right to condemn. During the course of the proceedings on March 21, 1983, the LIRR's representative further stated that he had "a continuing objection to this hearing on the grounds LILCO has no right to condemn property of Long Island Rail Road used for a prior public use".

The LIRR also claimed that the condemnation would eliminate LILCO's present contractual obligations including its duty to indemnify the LIRR, to maintain the LIRR facilities, to reimburse the LIRR for certain expenditures and to undertake a number of additional affirmative duties set forth in the agreement.

LILCO responded that it was entitled to condemn easements because joint use of the property was not inconsistent with the purposes of either use. However, LILCO amended the proposed condemned easements so as to include therein, as conditions, virtually all of the affirmative obligations placed upon it by the occupation agreements.

By decision dated May 3, 1983 it was determined that the condemnation of the Oyster Bay and West Hempstead easements should be consummated.

Thereafter, the LIRR initiated this proceeding seeking a judicial review of LILCO's determination and findings, alleging that the subject acquisition is not within LILCO's statutory jurisdiction and authority (EDPL 207, subd [C], par [2]).

EDPL 207 (subd [C]) provides: "(C) The court shall either confirm or reject the condemnor's determination and findings. The scope of review shall be limited to whether:

"(1) the proceeding was in conformity with the federal and state constitutions,

"(2) the proposed acquisition is within the condemnor's statutory jurisdiction or authority,

"(3) the condemnor's determination and findings were made in accordance with procedures set forth in this article, and

"(4) a public use, benefit or purpose will be served by the proposed acquisition".

## THE LIRR'S CONTENTIONS

As heretofore mentioned, the LIRR resists condemnation of its property on three grounds: (1) that LILCO has no statutory authority to condemn property of the LIRR because the latter is a political subdivision of the State of New York; (2) that even if statutory authority exists to empower LILCO to condemn property owned by the LIRR, such authority does not extend to the property interests at bar which are acknowledged to be devoted to a prior public use, and (3) that the presence of LILCO's facilities pursuant to easements on the railroad right of way will cause substantial interference with the LIRR's operations.

### (1) *The LIRR is not a Political Subdivision of the State of New York*

There is no question that the property LILCO seeks to condemn is devoted to a public use in that it is currently being used by the LIRR as an active operating right of way for its passenger trains. Indeed, LILCO does not deny that fact. The first point on which they disagree is whether the LIRR is a political subdivision of the State whose property is exempt from condemnation by LILCO.

LILCO derives its power of eminent domain from section 11 of the Transportation Corporations Law. In relevant part that section provides that:

"3-a. An electric corporation and a gas corporation shall have power and authority to acquire such real estate as may be necessary for its corporate purposes and the right of way through any property in the manner prescribed by the eminent domain procedure law.

"3-b. The construction, use and maintenance by an electric corporation of transmission, distribution and service lines and wires in, over or under any street, highway or public place and the construction, use and maintenance by a gas corporation of transmission, distribution and service pipes, conduits, ducts or other fixtures in, over or under any trees, highway or public place, as may be necessary for its corporate purposes, are hereby declared to be public uses and purposes.

*"Where any person or corporation other than the state, a political subdivision thereof, or a municipality is the owner of any right, title or interest in or to any street, highway or public place, or in or to the land on which the street, highway or public place is located, an electric corporation or a gas corporation is hereby authorized and empowered to acquire the right to construct, use and maintain such lines or wires and such pipes, conduits, ducts or other fixtures, in, over or under such street, highway or public place, from such owner or owners, by petition in the manner prescribed by section four hundred two of the eminent domain procedure law to the supreme court in the county in which such street, highway or public place is situated.* The corporation shall file with the court a certificate of the public service commission certifying that the right sought to be acquired is necessary and in the public interest and such certificate shall be conclusive evidence as to the matters lawfully certified therein.

"After a hearing on such petition and any answer thereto, if the court shall find that such right to construct, use and maintain is necessary for the corporate purposes of the corporation, it shall enter its judgment adjudging that such right is necessary for the public use and that the corporation is entitled to construct, use and maintain its

lines or wires or pipes, conduits, ducts or other fixtures in, over or under such street, highway or public place and adjudging pursuant to the eminent domain procedure law the compensation to be made by the corporation to the owner or owners" (emphasis added).

Thus, it will be seen that LILCO has broad powers of eminent domain but that they do not extend to the property of the State, a political subdivision thereof, or a municipality.

As noted above, the LIRR is a New York State public benefit corporation. In *Grace & Co. v State Univ. Constr. Fund* (44 NY2d 84), the Court of Appeals was called upon to decide whether the defendant, as a public benefit corporation, was identical with the State of New York or any of its agencies. The question in that case was the applicability of statutes (L 1974, chs 944, 945) enacted by the Legislature in order to provide equitable relief to contractors who had previously been awarded construction contracts and were thereafter caused damage by reason of the energy crisis. After analyzing the powers, functions and obligations of the State University Construction Fund, the court concluded that it was not identical with the State and held the legislation inapplicable to it. In an opinion by then Judge (now Chief Judge) Cooke, the court stated (44 NY2d 84, 88-90, *supra*):

"We begin our inquiry, then, with the proposition that public benefit corporations, such as the Fund, created by the State for the general purpose of performing functions essentially governmental in nature, are not identical to the State or any of its agencies, but rather enjoy, for some purposes, an existence separate and apart from the State, its agencies and political subdivisions (*Matter of Smith v Levitt*, 37 AD2d 418, 421, affd 30 NY2d 934; *Matter of New York Post Corp. v Moses*, 10 NY2d 199, 203; *Benz v New York State Thruway Auth.*, 9 NY2d 486, 489; *Pantess v Saratoga Springs Auth.*, 255 App Div 426, 428). Although there is necessarily some degree of relationship between the Fund and the State — the fund was created by the State and is subject to dissolution by the Legislature — as a public benefit corporation, the Fund is 'independent and autonomous, deliberately designed to be able to function

with a freedom and flexibility not permitted to an ordinary State board, department or commission' or agency (see *Matter of Plumbing, Heating, Piping & Air Conditioning Contrs. Assn. v New York State Thruway Auth.,* 5 NY2d 420, 423; see, also, 1951 Opns Atty Gen 130, 132).

"The distinction is at once obvious. The mere fact that the Fund is an instrumentality of the State, and as such, engages in operations which are fundamentally governmental in nature does not inflexibly mandate a conclusion that it is the State or one of its agencies for purposes of chapters 944 and 945 (compare *Easley v New York State Thruway Auth.,* 1 NY2d 374, 376-377, with *Matter of Plumbing, Heating, Piping & Air Conditioning Contrs. Assn., supra,* p 424). Instead, a particularized inquiry into the nature of the instrumentality and the statute claimed to be applicable to it is required * * *.

"We conclude, therefore, that upon consideration of its powers, functions and obligations, that the Fund, which enjoys a separate existence, independently transacts its business and hires and compensates its own personnel outside of the civil service system, is not identical with the State, nor is it one of its various agencies for purposes of chapters 944 and 945 of the Laws of 1974 and, hence, is not subject to those statutes".

Applying the reasoning of the foregoing opinion to this case, it is clear that the LIRR is neither identical with the State nor one of its political subdivisions.

The LIRR operates railroad lines in New York City and Nassau and Suffolk Counties primarily carrying commuting passengers between their jobs in the city and their homes in the suburbs. In addition, the LIRR carries a relatively small amount of freight. While it is true that a substantial number of the people of the State of New York benefit from the services offered by the LIRR, the case at bar presents a stronger case than the *Grace* case (*supra*) for holding that the public benefit corporation in question is not a political subdivision of the State because it can hardly be said that the petitioner is engaged in operations which are fundamentally governmental in nature. Manifestly, the LIRR enjoys a separate existence from the State pursuant to which it transacts its own nongovernmental

business and hires, compensates and fires its own personnel. Hence, we conclude that it is not a "political subdivision" of the State within the intendment of subdivision 3-b of section 11 of the Transportation Corporations Law. That being so, it cannot be said that LIRR property is exempt from a taking by an electric or gas corporation.

(2) *LILCO's Power to Condemn Extends to Property Already Devoted to a Public Use*

Having found that LIRR property is not automatically exempt from a taking, the question which next arises is whether the power of acquisition granted to electric and gas corporations by subdivision 3-b of section 11 of the Transportation Corporations Law extends to property already devoted to a public use. Our answer to that question is "yes".

It is clear that subdivisions 3-a and 3-b of section 11 of the Transportation Corporations Law contain a broad, express grant of condemnation power to electric and gas corporations in order to construct and maintain facilities in, over or under any street, highway, or public place. If the case before us involved a situation where LILCO was seeking to condemn an interest in the property which would terminate the LIRR's use of its right of way, then, in that case, the grant of authority under section 11 of the Transportation Corporations Law would be inadequate. This is so because it is generally held that "[u]nless there is express legislative action permitting the contrary, the rule is that railroad property being used for a public purpose cannot be condemned for another and different public use" (19 NY Jur, Eminent Domain, § 51). This doctrine is referred to by the parties as the "prior public use" rule.

But that is not the situation in this case. LILCO does not seek to erect new transmission facilities to the exclusion of the LIRR. All that LILCO is attempting to do is to maintain facilities at the same locations where they have existed for many years. At most, LILCO seeks to continue its joint occupation of the rights of way in question with the LIRR as it has done since 1968 and 1969, respectively. Stated otherwise, LILCO is seeking to appropriate a limited interest in the property for a use not inconsistent with the use thereof by the railroad and it has successfully

fashioned its taking so that the proposed condemnation comes within an exception to the afore-mentioned prior public use doctrine.

In its reply brief, the LIRR notes that "LILCO has failed to cite a single New York case where a condemnor has been permitted to take a longitudinal easement along a railroad right-of-way for purposes of an electric line". However, and conversely, the LIRR cites no New York cases which prevent a condemnor from taking such an easement for joint occupancy purposes when the uses may coexist without interfering with one another. New York authority, while not precisely on point, favors LILCO's position. For example, in *Matter of City of New York (West 134th St.)* (143 App Div 258, 261, revd on other grounds 204 NY 465), it was stated that "[t]he fact that a part of the proposed street consists of land now used for railroad purposes does not prevent the opening of the street * * * and the acquisition of the necessary title to the lands required, because the use of the land for railroad purposes is not necessarily inconsistent with its use for highway purposes". The New York treatises state the proposition as follows: "[t]he general rule against appropriation of property held for a public purpose is also not applicable where only an easement not interfering with the first public use is sought" (17 Carmody-Wait 2d, NY Prac, § 108:12). "Railroad property may be appropriated for a use not inconsistent with its use by the railroad" (19 NY Jur, Eminent Domain, § 51; see, also, Public Authorities Law, § 2700). While no New York case has been found which is squarely on point, both sides agree that there is little question that the overwhelming majority of jurisdictions which have considered this issue have concluded that condemnation of an interest in property already devoted to a public use is permitted where the second use does not materially interfere with the first. One notable treatise sums up the matter as follows:

"In view of the fact that the general rule denying the right to take property already devoted to a public use is predicated upon the theory that the existing use is thereby impaired or destroyed, the fact that such use will not be materially impaired or destroyed is sufficient to take the case out of the general rule * * *

"A particular public easement may be imposed upon land already subject to a different public easement *without express legislative authority* if the exercise of the second easement will not interfere with the exercise of the first * * * This rule has been extended so as to justify the imposition of an easement *without express legislative authority* upon land already devoted to a different public use * * * when such detriment is trivial and the two easements can be exercised at the same time without serious conflict * * * Thus, a taking of the right to maintain telegraph poles and wires along a railroad right of way or a turnpike *may be effected without express legislative authority*" (1 Nichols, Law of Eminent Domain [rev 3d ed], § 2.2[8]; emphasis added).

Consequently, we hold it to be the law in this State that the grant of authority found in section 11 of the Transportation Corporations Law is sufficient to empower LILCO to condemn the limited interest sought herein unless the evidence establishes that its proposed easement will materially interfere with the LIRR's existing public use.

(3) *The Presence of LILCO's Facilities Pursuant to Easements on the Railroad Rights of Way Will Not Cause Substantial Interference with the LIRR's Operation*

As can be seen from the above analysis, the final issue to be resolved is the LIRR's claim that the presence of LILCO's facilities on its rights of way will cause substantial interference with its use of the property. According to the LIRR, the electric facilities are located so near the tracks and for such a distance along the tracks that interference is not only probable, it is inevitable, if the facilities ever require repair and/or maintenance in the future. However that may be, the LIRR is unable to point to any threat or anticipated harm which has not been effectively eliminated by the conditions which LILCO has incorporated into the proposed easements. Based on those facts, the determination and findings now being reviewed stated:

"[T]here is no reasonable basis — if there ever was one — for the contention that LILCO will unreasonably interfere with LIRR's use of the right of way. The parties have operated safely under the Nassau County General Occupation Agreement since 1952 and all of the salient provisions

thereof are now incorporated in the easements which LILCO seeks to condemn. Since the parties have operated their respective facilities safely for so many years, it cannot be supposed that the change in the legal form of the obligation — from one governed by contracts to one governed by easements — should make the slightest difference or should deter future cooperation.

"Indeed, LIRR's Chief Engineer has admitted that as a result of the Nassau County Occupation Agreement, for the past thirty years there has been 'orderly co-existence on a daily basis of the Railroad, and the power company' * * * All of the 'interference' hypothesized in his original affidavit * * * is expressly based on the assumption that the Nassau County Occupation Agreement will not continue in effect * * * Since, as we have shown, all salient provisions of the Nassau County Agreement are included in the easement, there is no longer even a colorable basis for the claim of 'interference' and certainly no basis for a finding of material or destructive interference".

. Our review is limited to the question of whether LILCO's determination and findings were predicated upon a rational factual basis (*Kaskel v Impellitteri*, 306 NY 73, cert den 347 US 934). If the condemnor presents an adequate basis on which it made its conclusion, and the condemnee cannot show that the determination is without foundation, the determination should be confirmed (17 Carmody-Wait 2d, NY Prac, § 108:86). The record before us contains ample evidence to support the determination and findings under review.

We have reviewed the other contentions asserted by the LIRR and find them to be lacking in merit.

Accordingly, the determination and findings should be confirmed and the petition should be dismissed, with costs.

LAZER, J. P., MANGANO and GIBBONS, JJ., concur.

Determination and findings of the respondent Long Island Lighting Company, dated May 3, 1983, confirmed, with costs, and proceeding dismissed.