[839 NYS2d 127]

In the Matter of 49 WB, LLC, Petitioner, v VILLAGE OF HAVER-STRAW et al., Respondents.

Second Department, June 19, 2007

**APPEARANCES OF COUNSEL**

*Feerick Lynch MacCartney PLLC*, South Nyack (*J. David Mac-Cartney* of counsel), for petitioner.

*Watkins & Watkins, LLP*, White Plains (*John E. Watkins, Jr.,* and *Liane V. Watkins* of counsel), for respondents.

## OPINION OF THE COURT

DILLON, J.

The decision of the United States Supreme Court in *Kelo v New London* (545 US 469 [2005]) has reshaped, in certain respects, the concept of eminent domain. For the first time, the Supreme Court held that a municipality's taking of nonblighted private property by eminent domain, in furtherance of a plan for economic development that would be open for use by the general public, constitutes a permissible "public use" within the meaning of the Fifth Amendment of the Federal Constitution (*id.* at 487-490). The five-judge majority in *Kelo* emphasized that nothing in its decision prevented states from placing restrictions upon the exercise of eminent domain specifically through state statutes or constitutional interpretations as to what qualifies as a "public use." *Kelo* was controversial at the time of its issuance,[1] as it granted municipalities greater license to interpret the "public use" of its takings, subject to superior state law. Eminent domain may now represent a growth industry for litigation over the purported public uses which have formed the basis for takings of private property.

The instant petition may represent one of the earliest post-*Kelo* litigations in the State of New York. The issues are threefold and all appear to be, for us, questions of first impression: (1) regarding the timeliness of a petition seeking judicial review of a municipal determination and findings, whether the date from which the statute of limitations is measured runs from the minimum second date of publication of the determination and findings, as required by EDPL 204 (A), or from the completion of additional publications beyond the minimum under EDPL 207 (A); (2) assuming a timely petition, whether the municipal condemnor here exercised its eminent domain authority over private property in furtherance of a "public use" (EDPL 207 [C] [4]), or as a mere pretext conferring a private benefit; and (3) whether the petitioner is entitled to an award of

---

1. No fewer than 17 bills were introduced in the New York State Legislature shortly after *Kelo* to protect property from government-aided developers (*see* Caher, *'Kelo'-Related Bills Pass Senate Judiciary Body*, NYLJ, May 3, 2006, at 2, col 6). The New York State Bar Association called upon the Legislature to create a commission on eminent domain, to avoid a "backlash" to the *Kelo* ruling (*see* Caher, *State Bar Backs Study to Moderate Post-'Kelo' Backlash*, NYLJ, Apr. 7, 2006, at 1, col 3).

attorneys' fees, costs, and disbursements under EDPL 702 (B) if the condemnor's determination and findings are rejected by the reviewing court.

For reasons set forth below, we find that the petition in this instance was timely filed within the applicable statute of limitations. We also find that a condemnation of property should be judicially rejected where, as here, its ostensible purpose of providing affordable housing was a pretext to benefit private entities resulting in the creation of less affordable housing than if there had been no taking of property at all, and the taking does not rationally relate to any other public purpose. Finally, we find that under EDPL 702 (B), the petitioner is not entitled to an award of legal fees, costs, and disbursements absent the condemnor's commencement or abandonment of proceedings under EDPL articles 4 through 6 to acquire vested title.

## I. Relevant Facts

The Graziosi Building is a two-story building located in Rockland County at 49 West Broad Street in the Village of Haverstraw. At the time the petition was brought, the building consisted of a dental office on the first floor and vacant offices on the second floor. In July 1999, Ginsburg Development Company, Harbors Haverstraw, LLC, and related entities (hereinafter collectively referred to as Ginsburg), informally proposed to develop the downtown Haverstraw Hudson River waterfront through a "public/private redevelopment project." Thereafter, on April 9, 2002, the respondent Village of Haverstraw, through its Board of Trustees (hereinafter collectively the Village), adopted a resolution requiring Ginsburg to develop 40 affordable housing units within the waterfront development district, and to identify, rehabilitate, or construct approximately 85 additional scattered-site units that would provide affordable housing incidental to the revitalization of the downtown waterfront.

Graziosi Realty, LLC, which owned the Graziosi Building, had listed the property for sale in 1999. Efforts to sell the property to Louis Wu in 2004 and to Housing Opportunity for Growth, Advancement and Revitalization, Inc. (hereinafter HOGAR), in 2005 were unsuccessful. The Graziosi Building was sold to the petitioner, 49 WB, LLC (hereinafter 49 WB), pursuant to a written contract dated April 28, 2005, with title passing to 49 WB on June 27, 2005.

HOGAR is the Village's designated affordable housing and neighborhood preservation not-for-profit organization, and is also a tenant of the Graziosi Building. While HOGAR, during

its tenancy at the Graziosi Building, had always intended to purchase and develop the property, HOGAR could not meet the financing requirements of various proposed purchase contracts.

Eleven days after 49 WB's purchase of the Graziosi Building, the Village published notice of a public hearing on its proposed acquisition of the property through eminent domain. Public hearings were conducted on four dates between July 25, 2005, and September 19, 2005. In addition to comments on the proposed acquisition by various members of the public, the hearing focused on two competing proposals for the development of the Graziosi Building. HOGAR proposed to add a third floor to the building and construct 16 residential condominiums on the second and third floors, to be sold to village residents and volunteers for between $175,000 and $220,000. The Village entertained HOGAR's proposal on condition that HOGAR would completely finance the acquisition of the Graziosi Building for the Village, and according to HOGAR, its financing was in place by the time of the public hearings.

The second competing proposal was from 49 WB as the owner of the Graziosi Building. 49 WB offered to provide six to eight affordable housing units on two additional floors to be constructed. The units would be rented to municipal employees and volunteers at 50% of the market rent so that the remaining 50% could be applied toward the tenants' future home purchases in the village. 49 WB also promised HOGAR a long-term lease for its offices at the Graziosi Building. 49 WB argued that HOGAR's proposal of selling condominiums was a "one shot deal" as compared with 49 WB's rolling rentals that would enable more persons over time to "launch into the next phase of home ownership."

There were no adverse environmental impacts from the proposed development and the Village issued a negative declaration pursuant to the State Environmental Quality Review Act (ECL art 8 [SEQRA]). The Village passed a resolution on November 29, 2005, adopting its determination and findings, authorizing and directing its counsel to take whatever steps were necessary to acquire the Graziosi Building by gift, purchase, or condemnation. The Village found condemnation appropriate to effect the public purpose of providing a centrally-located health care center and affordable housing, as well as suitable office space for HOGAR.

II. Statute of Limitations

Legal notice of the determination and findings was prepared and dated December 12, 2005, and published in the Journal

News on five consecutive dates, December 15, 2005, through December 19, 2005. The legal notice advised that pursuant to EDPL 207, "there [were] thirty days from the completion of the condemner's newspaper publication requirement to seek judicial review of the condemner's determination and findings."

49 WB sought judicial review of the Village's determination and findings pursuant to EDPL 207 by the filing of a petition on January 18, 2006. The petition alleges that the condemnation proceeding did not conform to federal or state constitutional mandates; that the acquisition was not within the condemnor's statutory jurisdiction; that the acquisition violated SEQRA; and that the acquisition did not achieve a public use, benefit, or purpose. The Village's answer denied the material allegations of the petition and asserted, inter alia, a defense that the petition was filed beyond the applicable statute of limitations.

The EDPL provides a right of judicial review, directly to the Appellate Division of the department in which the property is located, for persons aggrieved by a determination and findings that authorize a condemnation. The merits of the petition in this instance are not reached unless the petition is timely (*accord Matter of City of New York [Grand Lafayette Props. LLC]*, 6 NY3d 540, 548 [2006]; *see Matter of Turner v State of N.Y. Dept. of Transp.*, 97 AD2d 628 [1983]). A 30-day statute of limitations is imposed by EDPL 207 (A) (*see Matter of City of New York [Grand Lafayette Props. LLC], supra* at 546; *Steel Los III, LP v Power Auth. of State of N.Y.*, 33 AD3d 990 [2006]), measured from "the condemnor's completion of its publication of its determination and findings pursuant to [EDPL 204]." EDPL 204 (A) requires, in turn, that the condemnor publish its determination and findings, including a brief synopsis thereof, "in at least two successive issues of an official newspaper if there is one . . . and in at least two successive issues of a newspaper of general circulation."[2] The publication must occur within 90 days from the conclusion of the condemnor's public hearings (*see* EDPL 204 [A]; *Matter of Legal Aid Socy. of Schenectady County v City of Schenectady*, 78 AD2d 933, 934 [1980]).

While EDPL 204 (A) requires publication of the determination and findings in at least two successive issues, the publica-

---

**2.** If an officially-designated newspaper is also one of general circulation in the locality, publication in such paper is sufficient (*see* EDPL 204 [A]).

tion in this matter appeared for five successive days, from December 15, 2005, to December 19, 2005.[3]

The Village and 49 WB measure the statute of limitations in two conflicting ways. The Village maintains that since EDPL 204 (A) only requires publication in at least two successive issues, the requirements of the statute were "completed" upon publication on the second successive day, December 16, 2005, notwithstanding the unnecessary and voluntary publications that appeared in the Journal News for three days thereafter. In measuring the statute of limitations from December 16, 2005, the limitations period would expire 30 days later on January 15, 2006. We note that January 15, 2006, was a Sunday and that the following day, January 16, 2006, was Martin Luther King, Jr., Day, thus extending the statute of limitations to Tuesday, January 17, 2006 (see General Construction Law §§ 24, 25 [1]). Under the Village's calculations, the filing of the petition on Wednesday, January 18, 2006, was untimely by one day.

By contrast, 49 WB argues that judicial review of the condemnation under EDPL 207 was timely sought. It notes that EDPL 204 (A) does not require publication of the determination and findings for "two days," but rather, for "at least" two days, allowing condemnors such as the Village to publish their legal notices for more than two days. Here, the Village's publications were not "completed" until the fifth day, December 19, 2005, as a result of which 49 WB argues that the filing of its petition on January 18, 2006, was timely. The issue of whether or not the statute of limitations is to be measured from the second day of publication, or from the completion of all successive publications, has not been addressed by prior decisional authority. It is also an issue that may be of importance to future challenges to the exercise of eminent domain.

■ We are persuaded that 49 WB's interpretation of EDPL 204 (A) and 207 (A) is correct and that the statute of limitations should be measured from the Village's completion of its publications on the fifth day. We base this conclusion on discrete aspects of the controlling statutory language.

---

**3.** When publishing the determination and findings for five days, the Village may have confused the publication requirements of EDPL 202 with those of EDPL 204 (A). EDPL 202 requires that notice of public hearings for potential condemnations be published in at least five successive issues of an official or daily newspaper (see EDPL 202 [A]; Matter of W.C. Lincoln Corp. v Village of Monroe, 295 AD2d 440 [2002]). EDPL 204 (A) requires, by contrast, that a determination and findings be published, with a synopsis, in at least two successive issues.

Statutes are to be interpreted in accordance with their plain and unambiguous meaning, without regard to expressions of hope or understanding that may be at odds with those expressed terms (*see Matter of Briffel v County of Nassau*, 31 AD3d 79, 85 [2006], *affd* 8 NY3d 249 [2007]; *Ragucci v Professional Constr. Servs.*, 25 AD3d 43, 47 [2005]). Our primary purpose in interpreting the statute is to ascertain and give effect to the intent of the Legislature, and the best evidence of that intent is the plain wording of the statute itself (*see Desiderio v Ochs*, 100 NY2d 159, 169 [2003]; *Riley v County of Broome*, 95 NY2d 455, 463 [2000]).

Here, the plain language of EDPL 204 (A) does not limit the notice requirement to two actual successive newspaper issues. Instead, notice of the determination and findings must be published "in *at least* two successive [newspaper] issues" (EDPL 204 [A] [emphasis added]). The statute's inclusion of the words "at least" suggests that the Legislature envisioned that the publication span any number of days at the option of the condemnor, though never less than a two-issue minimum. Had the Legislature intended for the second day of publication to trigger the statute of limitations, it could have so declared, and there would have been no reason for the statute to include the language that publication be for "at least" two issues. The statutory language therefore vests the condemnor with the discretion to publish its notice in two successive issues, or for more than two days such as the five-day notice published by the Village here.

There is more than one purpose served by the publication requirement of the EDPL. The first and most obvious purpose is to assure notice of the condemnor's determination and findings to all persons who may seek to challenge the acquisition of property through the judicial process (*see Brody v Village of Port Chester*, 434 F3d 121, 129 [2005]). The right to challenge a determination and findings "has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest" (*Brody v Village of Port Chester, supra* at 129, citing *Mullane v Central Hanover Bank & Trust Co.*, 339 US 306, 314 [1950]). The means and content of the required notice, as defined by the EDPL, have passed constitutional scrutiny (*see Matter of De Vito v City of Troy*, 72 AD2d 866, 867 [1979]).

The second purpose served by the requirement that the determination and findings be published is to fix a date from which

to measure the condemnees' 30-day statute of limitations. In this regard, EDPL 207 (A) expressly defines the statute of limitations as "thirty days after the *condemnor's completion of its publication* of its determination and findings pursuant to [EDPL 204]" (emphasis added). On its face, therefore, EDPL 207 (A) speaks to the condemnor's "completion" of "its" publication, which is necessarily dependent on the number of days the condemnor chooses to publish the notice. EDPL 207 (A) does not measure the statute of limitations from "the" publication or from any specific date of publication, but instead invokes the more flexible concept that the limitations period runs from whatever date the condemnor completes "its" publication, which in this instance is the Village's fifth day of notice on December 19, 2005.

The Village can take no solace from the language of EDPL 207 (A) that renders publication "pursuant to" EDPL 204 (A). EDPL 204 (A) merely requires that the condemnor's notice be published in "at least" two successive issues, which requirement the Village satisfied. However, EDPL 204 (A) does not, by its language, prohibit additional publications. Recognizing, as we do, that a purpose of publication is to provide persons with notice of the taking so that judicial review may be invoked, the Village's fifth day of publication represents the "completion of its publication" pursuant to EDPL 207 (A). In other words, EDPL 204 (A) and 207 (A), when read together, fix the statute of limitations as commencing on the second successive day of publication when the condemnor publishes for only a two-day minimum, or, as here, on the date that the condemnor completes its additional successive publications, whichever is later.[4]

On a more basic level, this Court is compelled to reject the Village's interpretation of EDPL 204 (A) and 207 (A) as it utilizes the statute as both a sword and a shield. Since the Village voluntarily chose to exceed the minimal notice requirements of EDPL 204 (A), it cannot now argue, in an effort to defeat a petition seeking judicial review of the determination and findings, that the minimal notice requirements trigger the running of the statute of limitations. Such an argument defies logic.

---

4. While we do not find the language of EDPL 204 (A) and 207 (A) to be ambiguous, which would require us to examine the legislation's history and debate (*see* McKinney's Cons Laws of NY, Book 1, Statutes § 92; *Carney v Philippone*, 1 NY3d 333, 340-342 [2004]), we note that an examination of documents maintained by the Legislature sheds no light on the issues before the Court.

Consequently, we conclude that since the petition was filed within 30 days from the Village's completion of its publication on December 19, 2005, the instant petition is timely and may be considered on its merits.

III. The Necessary "Public Purpose" of Condemnation

The EDPL was enacted in 1977 and superseded several statutes granting powers of eminent domain to various governmental entities (see EDPL 104; Matter of East Thirteenth St. Community Assn. v New York State Urban Dev. Corp., 84 NY2d 287, 293-294 [1994]). Generally, the power of eminent domain, as standardized by the EDPL, may be exercised to take private property as long as there is a legitimate public purpose to the taking (see Vitucci v New York City School Constr. Auth., 289 AD2d 479, 480 [2001]) and "just compensation" is paid to the owners for their properties (US Const Fifth Amend; NY Const, art I, § 7 [a]; EDPL 101; see Walker v City of Hutchinson, 352 US 112, 115 [1956]; Seaboard Air Line R. Co. v United States, 261 US 299, 306 [1923]; 520 E. 81st St. Assoc. v State of New York, 99 NY2d 43, 47 [2002]; Matter of Town of Islip [Mascioli], 49 NY2d 354, 360 [1980]; City of Buffalo v Clement Co., 28 NY2d 241, 258-261 [1971]; Matter of Village of Port Chester v Sorto, 14 AD3d 570, 571 [2005]; Murphy v State of New York, 14 AD3d 127, 132 [2004]).

What qualifies as a "public purpose" or "public use" is broadly defined as encompassing virtually any project that may confer upon the public a benefit, utility, or advantage (see Kelo, 545 US at 480; Matter of West 41st St. Realty v New York State Urban Dev. Corp., 298 AD2d 1, 6 [2002], cert denied 537 US 1191 [2003]; Vitucci v New York City School Constr. Auth., supra at 480). Whether a use to which property is to be devoted by a condemnor is, in fact, for the public benefit is a question to be determined by the courts based on the record (see Yonkers Community Dev. Agency v Morris, 37 NY2d 478, 485 [1975]; Fifth Ave. Coach Lines v City of New York, 11 NY2d 342, 349 [1962]; First Broadcasting Corp. v City of Syracuse, 78 AD2d 490, 497 [1981]). While courts are required to be more than "rubber stamps" in determining whether a taking furthers a public use (Yonkers Community Dev. Agency v Morris, supra at 485), a municipality's determination that property is needed for a public purpose is regarded as "well-nigh conclusive" and not a question of fact for de novo determination (Greenwich Assoc. v Metropolitan Transp. Auth., 152 AD2d 216, 221 [1989] [internal quotation marks omitted]). Consequently, the scope of any

judicial review of condemnation determinations must necessarily be narrow, as the exercise of authority under the EDPL is an essentially legislative function that includes, as a fundamental component, the conduct of a public hearing (*see Matter of West 41st St. Realty v New York State Urban Dev. Corp.*, *supra* at 6, citing *Kaskel v Impellitteri*, 306 NY 73, 80 [1953], *cert denied* 347 US 934 [1954] and *Matter of New York City Hous. Auth. v Muller*, 270 NY 333, 339 [1936]). A legislature's finding that a property condemnation furthers a public use or purpose should be affirmed unless it is "without foundation" in the hearing record (*see Matter of Waldo's, Inc. v Village of Johnson City*, 74 NY2d 718, 720 [1989], quoting *Matter of Jackson v New York State Urban Dev. Corp.*, 67 NY2d 400, 425 [1986]; *Matter of Stankevich v Town of Southold*, 29 AD3d 810, 811 [2006]; *Matter of Keegan v City of Hudson*, 23 AD3d 742 [2005]; *Matter of Rafferty v Town of Colonie*, 300 AD2d 719 [2002]; *Matter of West 41st St. Realty v New York State Urban Dev. Corp.*, *supra* at 6; *Long Is. R.R. Co. v Long Is. Light. Co.*, 103 AD2d 156, 168 [1984], *affd* 64 NY2d 1088 [1985]). The burden of proof is on 49 WB to establish that the municipality's determination and findings do not rationally relate to a conceivable public purpose (*see Matter of Waldo's, Inc. v Village of Johnson City*, *supra* at 720; *Matter of Jackson v New York State Urban Dev. Corp.*, *supra* at 420-421; *Matter of C/S 12th Ave. LLC v City of New York*, 32 AD3d 1, 11 [2006]; *Matter of Pfohl v Village of Sylvan Beach*, 26 AD3d 820, 821 [2006]; *Matter of Molly, Inc. v County of Onondaga*, 2 AD3d 1418 [2003]; *Matter of Kaufmann's Carousel v City of Syracuse Indus. Dev. Agency*, 301 AD2d 292, 303 [2002]; *Matter of West 41st St. Realty v New York State Urban Dev. Corp.*, *supra* at 6; *Matter of Bergen Swamp Preserv. Socy. v Village of Bergen*, 294 AD2d 827, 828 [2002]; *East Thirteenth St. Community Assn. v New York State Urban Dev. Corp.*, 189 AD2d 352, 359, *affd* 84 NY2d 287 [1994]; *Lubelle v City of Rochester*, 145 AD2d 954 [1988]).

Based upon the foregoing principles, appellate courts have upheld the exercise of eminent domain for a variety of declared public uses. These include, but are not limited to, the taking of land for purposes of urban renewal (*see Matter of Jackson v New York State Urban Dev. Corp.*, *supra*; *Matter of Haberman v City of Long Beach*, 307 AD2d 313 [2003], *cert denied* 543 US 1086 [2005]; *Matter of West 41st St. Realty v New York State Urban Dev. Corp.*, *supra*), constructing public roadways and intersections (*see Matter of Waldo's, Inc. v Village of Johnson*

*City, supra*; *Matter of Rafferty v Town of Colonie, supra* at 719; *Matter of Gray v Town of Oppenheim*, 289 AD2d 743 [2001]; *Matter of Duryea v Town of E. Hampton*, 172 AD2d 752 [1991]; *Matter of Russin v Town of Union of Broome County*, 133 AD2d 1014 [1987]; *Kendall v County of Dutchess*, 130 AD2d 461 [1987]), maintaining the public shoreline (*see Matter of Pfohl v Village of Sylvan Beach, supra*), providing electrical power (*see Matter of Bergen Swamp Preserv. Socy. v Village of Bergen, supra*), constructing water tunnels (*see Matter of City of New York [Third Water Tunnel, Shaft 30B]*, 18 AD3d 342 [2005], *affd* 6 NY3d 540 [2006]), controlling sewage (*see Matter of Ranauro v Town of Owasco*, 289 AD2d 1089 [2001]; *Matter of City of Yonkers v Hvizd*, 93 AD2d 887 [1983]), providing a site for a general hospital (*see Matter of City of New York*, 280 App Div 196, *affd* 305 NY 835 [1953]), expanding airports (*see First Broadcasting Corp. v City of Syracuse, supra*), protecting the public from fire damage (*see Matter of Engels v Village of Potsdam*, 285 AD2d 699 [2001]), providing necessary public parking (*see Salvation Army v Central Islip Fire Dist.*, 230 AD2d 841 [1996]; *Village Auto Body Works v Incorporated Vil. of Westbury*, 90 AD2d 502 [1982]; *Matter of Incorporated Vil. of Garden City [Lorentzen]*, 15 AD2d 513 [1961]), developing blighted areas (*see Kelo, supra*; *Matter of Murray v LaGuardia*, 291 NY 320 [1943], *cert denied* 321 US 771 [1944]; *Matter of City of New York*, 114 NYS2d 787 [1952], *affd* 281 App Div 1024 [1953]), expanding public parks (*see Matter of Woodfield Equities LLC v Incorporated Vil. of Patchogue*, 28 AD3d 488 [2006]; *Matter of Faith Temple Church v Town of Brighton*, 17 AD3d 1072 [2005]), and expanding municipal buildings (*see Matter of Stankevich v Town of Southold, supra*). Indeed, the exercise of eminent domain has been upheld on appeal for the specific purpose, as relevant here, of providing affordable housing to local residents (*see Pennell v San Jose*, 485 US 1 [1988]; *Matter of Keegan v City of Hudson, supra* at 742; *accord Matter of East Thirteenth St. Community Assn. v New York State Urban Dev. Corp., supra*).

Challenges to the exercise of eminent domain are litigated on varied grounds, including the applicability of exemptions to public hearing requirements (*see* EDPL 206; *Matter of Sanitation Garage Brooklyn Dists. 3 & 3A*, 32 AD3d 1031 [2006]; *Matter of City of Albany*, 9 AD3d 551 [2004]; *Matter of Spittler v Town of Hamburg*, 4 AD3d 735 [2004]), compliance with SEQRA (*see Matter of C/S 12th Ave. LLC v City of New York, supra*; *Matter of Stankevich v Town of Southold, supra*; *Matter of Wood-*

*field Equities LLC v Incorporated Vil. of Patchogue, supra*), and the adequacy of compensation in exchange for the condemned property (*see* EDPL 303, 304; *Matter of City of New York v Mobil Oil Corp.*, 12 AD3d 77 [2004]; *Matter of Molly, Inc. v County of Onondaga, supra*; *ERA Realty v State of New York*, 281 AD2d 388 [2001]; *Pritchard v Ontario County Indus. Dev. Agency*, 248 AD2d 974 [1998]).

Where, as here, "public use" is specifically at issue, challenges to the condemnation fall into two broad categories; namely, public versus private benefits to be realized from the taking, and the condemnor's good versus bad faith. The first category is often disputed in reported cases. Eminent domain cannot be used as a mere pretext for conferring benefits upon purely private entities and persons (*see e.g. Kelo*, 545 US at 478; *Matter of Woodfield Equities LLC v Incorporated Vil. of Patchogue, supra* at 489). The existence of a public use, benefit, or purpose underlying a condemnation is a sine qua non to petitions under EDPL 207. Nonetheless, the fact that an intended public use confers incidental benefit to private persons or entities will not invalidate the condemnation of private property (*see Kelo, supra* at 478; *Matter of Waldo's, Inc. v Village of Johnson City, supra* at 721; *Yonkers Community Dev. Agency v Morris, supra* at 482-483; *Matter of West 41st St. Realty v New York State Urban Dev. Corp., supra* at 6; *Vitucci v New York City School Constr. Auth., supra* at 481; *Matter of Duryea v Town of E. Hampton, supra* at 752; *Rodrigues v Town of Beekman*, 120 AD2d 724 [1986]; *Matter of Terrace W. v City of Plattsburgh*, 73 AD2d 763 [1979]; *Evans v State of New York*, 34 AD2d 1007, 1008 [1970], *affd* 28 NY2d 844 [1971]; *Ross v State of New York*, 30 AD2d 681 [1968], *affd* 23 NY2d 807 [1969]; *Matter of Northeast Parent & Child Socy. v City of Schenectady Indus. Dev. Agency*, 114 AD2d 741, 742 [1985]; *Matter of Incorporated Vil. of Garden City [Lorentzen], supra* at 513). 49 WB alleges, and the Village denies, that the sole beneficiaries of the challenged condemnation are HOGAR, which obtains title to the Graziosi Building it has sought unsuccessfully to purchase in the past, and Ginsburg, which allegedly is credited toward its contractual affordable housing obligation with the 16 affordable units that are to be constructed by HOGAR.

A second, less frequent basis for challenging a condemnation, also at issue here, is the alleged bad faith of the condemnor (*see e.g. Matter of Woodfield Equities LLC v Incorporated Vil. of Patchogue, supra*; *Matter of Faith Temple Church v Town of Brigh-*

*ton, supra; Matter of Ranauro v Town of Owasco, supra* at 1090; *Village Auto Body Works v Incorporated Vil. of Westbury, supra* at 502). Bad faith is a concept separate and distinguishable from pretextual condemnations. Cases involving bad faith address procedural violations allegedly committed by municipalities resulting in condemnations that serve a legitimate public purpose (*see e.g. Matter of Faith Temple Church v Town of Brighton, supra; Matter of Ranauro v Town of Owasco, supra*). Bad faith arguments have also been made in cases where the property owner challenges the selection of its property for condemnation (*see e.g. Village Auto Body Works v Incorporated Vil. of Westbury, supra*). Petitioners face significant hurdles in challenging condemnations based on alleged bad faith. There must be a "clear showing" in the record of bad faith (*see Matter of Faith Temple Church v Town of Brighton, supra* at 1073; *Village Auto Body Works v Incorporated Vil. of Westbury, supra* at 502), and mere allegations of bad faith and suspicious timing, such as those alleged by 49 WB here,[5] do not suffice (*see Matter of Woodfield Equities LLC v Incorporated Vil. of Patchogue, supra* at 488; *Matter of Faith Temple Church v Town of Brighton, supra* at 1073). Absent a viable petition as to the Village's "bad faith," our determination must pivot upon whether 49 WB is able to establish, as is its burden, that the Village's determination and findings do not rationally relate to a conceivable public use, benefit, or purpose, or whether it merely confers private benefits to third parties.

EDPL 207 (C) specifically provides that upon review of a petition filed pursuant to the statute, the Appellate Division shall either confirm or reject the condemnor's determination and findings, with the scope of the review limited to whether:

> "(1) the proceeding was in conformity with the federal and state constitutions,
>
> "(2) the proposed acquisition is within the condemnor's statutory jurisdiction or authority,
>
> "(3) the condemnor's determination and findings were made in accordance with [statutory] procedures . . . , and

---

5.  49 WB alleges bad faith on the part of the Village by the suspicious timing of the first notice of the condemnation hearing, 11 days after its purchase of the Graziosi Building; by the "clouding" of marketable title from a history of condemnation proceedings that had been commenced against the Graziosi Building and then discontinued; and by the Village's admission that it had no use for the property itself other than for HOGAR to fully finance its acquisition and for title to then be immediately transferred by the Village to HOGAR.

"(4) [the proposed acquisition serves] a public use, benefit or purpose."

■ We find no flaw in the determination and findings with respect to the consideration required by EDPL 207 (C) (1), (2) and (3). The proceedings honored the parties' rights to notice and due process, were within the Village's eminent domain jurisdiction, and followed the statutory procedures of EDPL article 2. However, on this record, and recognizing the deference that is to be afforded to legislative findings, we find flaws in the condemnor's determination and findings under EDPL 207 (C) (4) that a public use, benefit, or purpose would be served by the Village's acquisition of the Graziosi Building.

More specifically, the determination and findings incorrectly conclude that the "public purpose" requirement of the EDPL is satisfied in three ways: (1) that the Graziosi Building, upon condemnation by the Village and then acquisition by HOGAR, is well-suited for a community outreach health center; (2) that the property provides a suitable location for HOGAR's offices; and (3) that the site supports the construction of up to 16 affordable housing units.

The first stated "public purpose" of the condemnation, regarding a community health center, is illusory. 49 WB had already leased a portion of the premises to a dentist, who was to extend his lease the day following the public hearing of August 15, 2005. The Village declares in the determination and findings that the property is "particularly suited for a community outreach health center." It fails, however, to determine that HOGAR would be more likely or successful in delivering a health center to the site, or that HOGAR would attract broader or higher quality health care services to residents of the Village than would 49 WB. For these reasons, the Village's determination and findings fail to articulate how or in what manner the condemnation of the Graziosi Building fosters any benefit to the public which would not be obtained absent the condemnation. Condemnation on this basis is without foundation in the evidence and must be rejected.

The second "public purpose" of the condemnation set forth in the determination and findings, regarding office space for HOGAR, is also illusory. HOGAR's offices were already present within the Graziosi Building pursuant to a one-year written lease dated October 31, 2002, which had been extended after its expiration on a month-to-month basis. 49 WB was willing to extend the tenancy on a long-term basis, but HOGAR's attorney,

perhaps in anticipation of the Village's exercise of eminent domain, did not respond to 10 to 15 telephone calls to discuss extended lease terms with 49 WB. The record is clear, given 49 WB's efforts to "match a lease to [HOGAR's] budget," that HOGAR does not need the property's condemnation to maintain its private offices, and accordingly, no "public purpose" is furthered by the exercise of eminent domain. Moreover, there is no foundational support in the record to conclude that any "public" benefit would flow from having a private, not-for-profit corporation such as HOGAR be an owner of its office space rather than a tenant.

The remaining "public purpose" that could support the Village's condemnation of the property concerns the construction of affordable housing for local residents and volunteers. The provision of affordable housing has been an ongoing policy of the Village arising from concern that the development of the Haverstraw waterfront area, including a large number of luxury condominiums, would gentrify the area at the expense of less affluent local residents. The development of the waterfront was therefore conditioned by the Village's resolution dated April 9, 2002, requiring that the developer, Ginsburg, provide 40 units of affordable housing within the waterfront development district, and assist in identifying, rehabilitating, and/or constructing an additional 85 scattered site units throughout the greater village.

The wording of the April 9, 2002, resolution is significant in that it permits the developer to "participate" with a designated community housing development organization, presumably HOGAR, to "identify and rehabilitate and/or construct" the 85 affordable units. The specific "and/or" language of the resolution does not require that the developer actually construct any of the units. The instant petition alleges that Ginsburg offered to contribute $180,000 towards HOGAR's purchase of the Graziosi Building from the Village upon the Village's exercise of eminent domain.[6] A financial contribution from Ginsburg to HOGAR of an unstated amount is conceded by the Village in its brief. Certainly, $180,000, if paid as alleged, would be considerably less than the cost to Ginsburg of "constructing" 16 affordable housing units itself.

---

6. Paragraph 60 of the petition contains several allegations. The Village's answer generally denies the entirety of the paragraph. If any financial contribution would run from Ginsburg to HOGAR, the Village would not necessarily possess knowledge or information sufficient to form a belief as to the allegation that Ginsburg contributed $180,000 to HOGAR.

A fair reading of the Village's resolution of April 9, 2002, permits the 16 affordable housing units proposed for construction by HOGAR to apply toward Ginsburg's 85-unit scattered-site obligation to the Village. The 16 units would qualify as having been "identified" by Ginsburg and HOGAR as affordable, without triggering the "and/or" language of the resolution that Ginsburg construct the units. The evidence that HOGAR's construction of 16 affordable housing units is intended by the Village as a credit toward Ginsburg's 85-unit obligation is found in the language of the Village's separate resolution dated November 29, 2005, which adopted its determination and findings. That resolution declared that the proposed use of the Graziosi Building "will further the objectives of the Local Waterfront Revitalization Program as more fully detailed in the program itself and in related documents." Absolutely no purpose is served by the resolution's reference to the Local Waterfront Revitalization Program and its related documents, except to link Ginsburg's affordable housing obligations contained therein with the 16 affordable units proposed by HOGAR. Waterfront revitalization documents do not relate to the other stated "public purposes" of the condemnation; namely, the acquisition of office space for HOGAR and the providing of a community outreach health center. The only relevance of waterfront redevelopment documents on the one hand, and the condemnation of the Graziosi Building on the other, is Ginsburg's and HOGAR's mutual efforts or obligations to provide affordable housing to the village.

With eminent domain, and with HOGAR's 16-unit proposal overlapping Ginsburg's obligation to "participate" in providing 85 affordable housing units, the total number of units produced by both entities remains at 85. By contrast, were the Village not to condemn the Graziosi Building and instead support 49 WB's development of 6 to 8 affordable rental units, those units, when added to Ginsburg's 85-unit obligation at scattered sites, would result in total affordable housing outside of the defined waterfront development district of 91 to 93 units. In other words, by exercising eminent domain, the Village achieves fewer affordable housing units for its residents and volunteers, whereas by not condemning the site, the Village would realize a *greater* number of affordable housing units. Under these circumstances, the condemnation of the Graziosi Building is without foundation in the record, as it fails to rationally relate to any beneficial housing-related public purpose, and is instead actually harmful to the stated affordable housing policies of the Village.

The Village's justification for the condemnation, that it serves a public use, benefit, or purpose, is merely pretextual, and hence, improper (*cf. Matter of Russin v Town of Union of Broome County*, *supra* at 1016). The only rational conclusion that can be drawn is that the Village's true purpose for condemnation was to assist its waterfront developer in meeting the developer's private scattered-site affordable housing obligation and to reduce costs to the developer. The condemnation solely benefits the private entities of Ginsburg and HOGAR. Evidence of the Village's true purpose is apparent from the resolutions of April 9, 2002, and November 29, 2005, which, when read together, bind the condemnation of the Graziosi Building, which is outside the waterfront development district, to Ginsburg's private obligations arising out of the waterfront development. Further evidence of the Village's sole purpose of assisting private entities by means of condemnation exists by the timing of the condemnation procedure, commenced mere days after 49 WB's acquisition of title to the property and after HOGAR's earlier efforts to purchase the building proved unsuccessful. Further, the Village's true purpose of aiding private entities through its power of condemnation is evidenced by the fact that the exercise of eminent domain yields fewer affordable housing units under the peculiar circumstances of this proceeding, than if no condemnation were to occur at all. Finally, a condemnation that vests HOGAR with ownership rights to a premises, as opposed to its continued tenancy, advances HOGAR's interests as a private entity without benefit to the public. The Village's assistance to Ginsburg and HOGAR was to be accomplished at the expense of 49 WB's right to its continued ownership, use, and enjoyment of its private property.

By this opinion, we do not suggest that private owners of property can avoid the proper exercise of a municipality's condemnation authority by merely offering to utilize the property in the same manner as intended by the municipality. Instead, our opinion rests upon the evidentiary record that the Village invoked its power of condemnation for the sole purpose of benefitting private, and not public, interests. In reaching this conclusion, we recognize 49 WB's burden of establishing that the determination and findings do not rationally relate to a conceivable public use, benefit, or purpose, by which the condemnation is without foundation in the hearing record (*see Matter of Waldo's, Inc. v Village of Johnson City*, *supra* at 720; *Matter of Jackson v New York State Urban Dev. Corp.*, *supra* at

420-421; *Matter of C/S 12th Ave. LLC v City of New York, supra* at 11; *Matter of Pfohl v Village of Sylvan Beach, supra* at 821). Our review of the record (*see Yonkers Community Dev. Agency v Morris, supra* at 485; *Fifth Ave. Coach Lines v City of New York, supra* at 349; *First Broadcasting Corp. v City of Syracuse, supra* at 497) leads us to the inescapable conclusion that 49 WB met its burden.

Tellingly, the Village's determination and findings, in discussing the public purposes to be achieved by condemnation in this instance, fails to address or even acknowledge 49 WB's proposals to provide HOGAR with an extended lease for its offices, attract a community outreach health center, and develop affordable rental units representing a "net gain" over the affordable housing obligations of others. 49 WB's proposals are conspicuously absent from the determination and findings because any acknowledgment of them would have undermined the Village's desired conclusion that the condemnation of the property serves public purposes.

Accordingly, we grant the petition to the extent of annulling the Village's determination dated November 29, 2005, authorizing condemnation of the subject property.

## IV. Attorneys' Fees, Costs, and Disbursements

EDPL 702 (B) provides that where, as here, a court of competent jurisdiction determines that the condemnor was not legally authorized to acquire property by eminent domain, or otherwise abandons efforts to acquire title to condemned property, the condemnee shall be reimbursed reasonable attorneys' fees and actual and necessary costs, disbursements, and expenses incurred in the property "acquisition procedure." 49 WB construes EDPL 702 (B) as entitling it to attorneys' fees, costs, and disbursements since the determination and findings is part of the "acquisition procedure" and an annulment of the determination and findings would constitute a holding that the Village was not legally authorized to acquire the Graziosi Building. The Village opposes any award of attorneys' fees on the ground that notwithstanding its determination and findings, it has not initiated any "acquisition procedure" by which the Village would acquire vested title to the Graziosi Building as required by EDPL articles 4 through 6.

The EDPL is crafted in a manner that divides the eminent domain process into two separate steps. EDPL article 2 sets forth the condemnation procedures including the publishing of notice and the conduct of public hearings (*see* EDPL 201, 202,

203), the rendering of the determination and findings and the publishing of notice thereof (*see* EDPL 204, 207 [A]), and the right of judicial review (*see* EDPL 207). EDPL articles 4 through 6 define the proceedings that must later be commenced to vest the condemnor with title to the condemned property. The articles include a statute of limitations (*see* EDPL 401 [A]), the filing of acquisition maps with notice to the condemnees (*see* EDPL 402 [A]), rules regarding judicial jurisdiction (*see* EDPL 501), venue (*see* EDPL 402 [B]), pleadings (*see* EDPL 402 [B] [3], [4]; 504, 507), the filing and service of the claims (*see* EDPL 502, 503), litigation procedures (*see* EDPL 506, 508, 509, 510, 511), methods of dispositions (*see* EDPL 402 [B] [5]; 512, 513), the abandonment of acquisitions by condemnors (*see* EDPL 406, 702 [B]), and appeals (*see* EDPL 514 [C], [D]; 604).

The "two-step" process set forth in the EDPL was recognized and discussed by the Court of Appeals in *Matter of City of New York (Grand Lafayette Props. LLC)* (6 NY3d 540 [2006], *supra*). The Court of Appeals discussed the first step as the process by which a determination is made by the condemnor to condemn property, followed by a separate "vesting proceeding" to transfer title in the property from the condemnee to the condemnor (*id.* at 543). On this record, only the first of the two steps has been undertaken by the Village.

EDPL 702 (B) authorizes an award to a condemnee of reasonable fees for attorneys, appraisers, and experts, plus costs and disbursements. The plain language of the statute limits any such award, however, to circumstances where the condemnor has "abandoned" efforts to acquire the property, or where the court determines that the condemnor was "not legally authorized to acquire the property." Significantly, any award of fees, costs, and disbursements are those actually incurred because of the "acquisition procedure" (*see* EDPL 702 [B]).

The operative word of the statute is "acquisition." Acquisition is separately defined by EDPL 103 (A) as "the act of vesting of title, right or interest to, real property for a public use, benefit or purpose, by virtue of the condemnor's exercise of the power of eminent domain." The "acquisition procedure" of EDPL 702 (B) that permits an award of fees under circumstances of abandonment or lack of authority is therefore a reference to the "second step" of eminent domain, when the condemnor seeks to vest title in condemned property (*see* EDPL 103 [A]; *accord Matter of City of New York [Grand Lafayette Props. LLC]*, *supra* at 543). Here, the Village has commenced no

vesting proceeding under EDPL articles 4 through 6 to obtain legal title to the Graziosi Building. Having commenced no such proceeding, it has "abandoned" no vesting rights envisioned by EDPL 406 and 702 (B). Additionally, the Village has not been found within the context of a judicial "vesting proceeding" to be unauthorized to acquire the property. This Court's holding that the Village's condemnation of the Graziosi Building serves no public purpose falls under the threshold "first step" condemnation process (*see* EDPL art 2) for which an award of fees is not statutorily authorized in favor of the condemnee. It is not within the scope of the "second step" acquisition procedures (*see* EDPL arts 4-6) in which fees may be awarded.

Accordingly, by construction of the plain language of EDPL 103 (A) and 702 (B), the petitioner, 49 WB, is not entitled to an award of attorneys' fees, costs, and disbursements, notwithstanding this Court's finding in its favor on the merits of the petition.

The parties' remaining contentions are without merit or have been rendered academic by our determination.

In sum, the petition is granted, on the law, to the extent of annulling the Village's determination and findings authorizing condemnation of the subject property, and the petition is otherwise denied.

MILLER, J.P., SPOLZINO and FISHER, JJ., concur.

Adjudged that the petition is granted, on the law, with costs, to the extent of annulling the determination of the Board of Trustees of the Village of Haverstraw dated November 29, 2005, and the petition is otherwise denied. [As amended by unpublished order entered Oct. 2, 2007.]