[815 NYS2d 516]

In the Matter of C/S 12TH AVENUE LLC, Petitioner, v CITY OF NEW YORK, Respondent. In the Matter of VALERAY REAL ESTATE CO., INC., Petitioner, v CITY OF NEW YORK, Respondent. In the Matter of MERCEDES-BENZ MANHATTAN, INC., Petitioner, v CITY OF NEW YORK, Respondent. In the Matter of 522 W. 38TH ST. NY LLC, Petitioner, v CITY OF NEW YORK, Respondent. In the Matter of MILSTEIN BROTHERS 42ND STREET, LLC, Petitioner, v CITY OF NEW YORK et al., Respondents.

First Department, May 25, 2006

2

### APPEARANCES OF COUNSEL

*Blank Rome LLP*, New York City (*James G. Greilsheimer, Cynthia B. Lovinger* and *Jesse Strauss* of counsel), for C/S 12th Avenue LLC, petitioner.

*Goldstein, Goldstein, Rikon & Gottlieb, P.C.*, New York City (*Michael Rikon* and *Jonathan Houghton* of counsel), for Valeray Real Estate Co., Inc. and another, petitioners.

*Todtman, Nachamie, Spizz & Johns, P.C.*, New York City (*Robert A. Rubenfeld* and *Richard Ciacci* of counsel), for 522 W. 38th St. NY LLC, petitioner.

*Stroock & Stroock & Lavan LLP*, New York City (*Stanley Parness* and *Deborah L. Goldstein* of counsel), for Milstein Brothers 42nd Street, LLC, petitioner.

*Michael A. Cardozo, Corporation Counsel*, New York City (*William Plache, Lisa Bova-Hiatt, Rochelle Cohen, Fred Kolikoff* and *Chris Reo* of counsel), for City of New York, respondent.

*Carter Ledyard & Milburn LLP*, New York City (*John R. Casolaro, Joseph M. Ryan* and *Susan B. Kalib* of counsel), for City of New York and another, respondents.

**OPINION OF THE COURT**

MALONE, JR., J.

In these five original consolidated proceedings commenced pursuant to Eminent Domain Procedure Law § 207, petitioners ask this Court to reject, annul and set aside the Determination and Findings of respondents City of New York and Metropolitan Transportation Authority (MTA) published October 3 and 4, 2005, which approved the acquisition of certain real property and/or easements thereto and zoning thereof for the project commonly referred to as the No. 7 Subway Extension—Hudson Yards Rezoning and Redevelopment Program (the Project). For the following reasons, we confirm the Determination and Findings and dismiss these five proceedings.

The purpose of the Project is to revitalize and transform the 300-acre area known as the Hudson Yards into a modern, pedestrian-friendly, multi-use extension of Midtown Manhattan, extending from West 24th to West 43rd streets between Seventh Avenue and the Hudson River Park on the West Side of Midtown Manhattan. As reflected in the seven-volume draft generic environmental impact statement (DGEIS), the proposed action of the City and the MTA, as co-lead agencies, consisted of: (1) adopting zoning amendments to permit the development of the Hudson Yards as a mixed-use community; (2) extending the No. 7 subway line from its current terminus at Times Square to a new terminus at West 34th Street and Eleventh Avenue; (3) expanding the Jacob K. Javits Convention Center; and (4) erecting a new multi-use facility for sports, entertainment and exposition that would house the New York Jets. The DGEIS also envisioned the creation of two major public open spaces: a park and boulevard system located in the midblocks between Tenth and Eleventh avenues from West 33rd to West 39th streets with a pedestrian connection to West 42nd Street and a subsurface public parking garage under a portion of this property between Tenth and Eleventh avenues from West 34th to West 36th streets, and a park on the block between Eleventh and Twelfth avenues and West 29th and West 30th streets (Block 675).

On September 23, 2004, the City and the MTA held a joint public hearing pursuant to the New York State Environmental

Quality Review Act ([SEQRA] ECL art 8), the New York City Environmental Quality Review procedures ([CEQR] 62 RCNY 5-01 *et seq.*) and New York City's Uniform Land Use Review Procedure ([ULURP] NY City Charter § 197-c) to receive public comment on the DGEIS for consideration in the preparation of the final generic environmental impact statement (FGEIS). Containing more than 8,000 pages of text, technical appendices, and summaries of and responses to public comments received on the DGEIS, the FGEIS evaluated the potentially significant environmental impacts of all of the elements of the Project, including the multi-use stadium. In addition, the FGEIS assessed the comparative impacts of 21 alternatives in 24 categories[1] for the reasonable worst case, i.e., range of effects that might occur if all proposed elements were approved and developed. Of the 21 alternatives, eight did not include the multi-use stadium.

On November 10, 2004, the FGEIS was accepted by the co-lead agencies and made available for public consideration. A "Co-Lead Agencies Findings Statement" under SEQRA and CEQR was adopted by the MTA and the New York City Planning Commission, respectively, on November 18 and 22, 2004. On January 19, 2005, the City Council issued its own SEQRA/CEQR findings statement as part of its approval of the ULURP applications, which, inter alia, implemented a rezoning plan and allowed for acquisition of the necessary property.

By notice dated May 20, 2005, respondents advised the public that they would conduct a hearing pursuant to EDPL article 2 on June 16, 2005 "to consider the proposed acquisition by condemnation of certain property in furtherance of the proposed [Project]." However, specifically removed from the table for discussion were the stadium and the Javits Convention Center as well as their respective financing costs and benefits.[2] Petition-

---

1. The 24 categories were: land use, zoning and public policy; socioeconomics; community facilities and services; open space and recreational facilities; shadows; architectural historic resources; archaeological resources; urban design and visual resources; neighborhood character; natural resources; hazardous materials; waterfront revitalization; infrastructure; solid waste and sanitation services; energy; traffic and parking; transit and pedestrians; air quality; noise and vibration; construction impacts; public health; unavoidable adverse impacts; growth-inducing impacts; and irreversible and irretrievable commitments of resources.

2. On or about June 6, 2005, the Public Authorities Control Board failed to approve the plan for the multi-use stadium, thereby eliminating it from the Project.

ers and others spoke at the hearing and/or submitted written comments within the allowable period.

On October 3 and 4, 2005, respondents issued and published their Determination and Findings which specifically limited their approval of the Project to three components: phase 1 for the construction of the extension of the No. 7 subway line; phase 2 for the creation of a midblock park and boulevard system running between Tenth and Eleventh avenues from West 33rd to West 39th streets with a subsurface public parking garage under a portion of this property between Tenth and Eleventh avenues from West 34th to West 36th streets; and phase 3 for the creation of a new active recreation park on Block 675 and possibly certain relocated municipal facilities which could be placed beneath it.

On November 2 and 3, 2005, five petitions were filed in this Court challenging the Determination and Findings. Petitioner Milstein Brothers 42nd Street, LLC (Milstein) owns property (temporary easements) subject to condemnation in phase 1; petitioners Mercedes-Benz Manhattan, Inc. (Mercedes) and 522 W. 38th St. NY LLC (522 LLC) own property subject to condemnation in phase 2; and petitioners C/S 12th Avenue LLC (C/S) and Valeray Real Estate Co., Inc. (Valeray) own property subject to condemnation in phase 3.

Our scope of review in reviewing the Determination and Findings in these EDPL proceedings is limited to whether (1) the proceeding was in conformity with the federal and state constitutions; (2) the proposed acquisition was within the condemnor's statutory jurisdiction or authority; (3) the condemnor's Determination and Findings were made in accordance with procedures set forth in EDPL article 2 and SEQRA; and (4) a public use, benefit or purpose will be served by the proposed acquisition (EDPL 207 [C]; *Matter of West 41st St. Realty v New York State Urban Dev. Corp.*, 298 AD2d 1, 3 [2002], *appeal dismissed* 98 NY2d 727 [2002], *cert denied* 537 US 1191 [2003]).

SEQRA Review—EDPL 207 (C) (3)

"[J]udicial review of a SEQRA determination is limited to determining whether the challenged determination was affected by an error of law or was arbitrary and capricious, an abuse of discretion, or was the product of a violation of lawful procedure" (*Matter of Village of Tarrytown v Planning Bd. of Vil. of Sleepy Hollow*, 292 AD2d 617, 619 [2002], *lv denied* 98 NY2d 609 [2002]). "[T]he courts may not substitute their judgment

for that of the agency for it is not their role to 'weigh the desirability of any action or [to] choose among alternatives' " (*Akpan v Koch*, 75 NY2d 561, 570 [1990], quoting *Matter of Jackson v New York State Urban Dev. Corp.*, 67 NY2d 400, 416 [1986]).

■ Petitioners' SEQRA claims, served on or about November 2-3, 2005, were within the 30-day statute of limitations to seek Appellate Division review of the EDPL 204 Determination and Findings published October 3 and 4, 2005 (EDPL 207 [A]), but are without merit.

We find that respondents satisfied their obligations under SEQRA by taking a "hard look" at the anticipated areas of environmental concern of the proposed project and making a "reasoned elaboration" of the basis for their determination (*see Matter of Jackson*, 67 NY2d at 417; *Matter of Village of Tarrytown*, 292 AD2d at 620). During the extensive review process, the lead agencies held scoping sessions, accepted the DGEIS and FGEIS and reviewed input from the community and experts before reaching their environmental findings (*cf. e.g. Matter of Gernatt Asphalt Prods. v Town of Sardinia*, 87 NY2d 668, 689-690 [1996]; *Matter of Save the Pine Bush v Planning Bd. of City of Albany*, 298 AD2d 806, 808 [2002]).

In addition, the FGEIS's consideration of 21 worst case scenarios in 24 categories, including eight which did not include the multi-use stadium, satisfied the substantive requirements of SEQRA. To be sure, " '[n]ot every conceivable environmental impact, mitigating measure or alternative must be identified and addressed' " (*Matter of Jackson*, 67 NY2d at 417); all that is required is that the agency analyze a *reasonable* range of alternatives to the proposed project (*Matter of Halperin* v *City of New Rochelle*, 24 AD3d 768, 777 [2005], *appeal dismissed* 6 NY3d 890 [2006]). Upon the meeting of this standard, "judicial inquiry is at an end" (*id.*).

The elimination of the stadium and convention center expansion did not render respondents' reliance on the FGEIS improper. The mere fact that a project has changed does not necessarily give rise to the need for the preparation of a supplemental EIS (SEIS). An SEIS is required only if environmentally significant modifications are made after issuance of an FEIS (*see Matter of Jackson,* 67 NY2d at 429-430). However, whether or not a modification is "significant" is for the agency to decide, after identifying the relevant areas of concern, again taking a "hard look" at the potential impacts, and making a reasoned elaboration for the basis of its determination (*id.*). The

FGEIS determined that high attendance events at the stadium and convention center would result in significant adverse traffic events approximately 19 times a year; however, commercial and residential development due to rezoning would result in more significant adverse traffic impacts during weekday peak hours. Further, the FGEIS estimated that the stadium would create 6,710 new jobs, generating $54 million in state and city tax revenues while the new commercial and residential development would create 225,941 new jobs and generate $1.628 billion in state and city tax revenues (using 2003 dollars). The FGEIS analysis of the rezoning and expansion of the No. 7 subway line with the stadium makes it clear that the stadium, while arguably the most controversial element of the proposed project, was not the Project's centerpiece.

EDPL 204

■ We reject as premature petitioner Milstein's claim that the determination was not compliant with EDPL 204 insofar as it failed to adequately apprise it of the nature, timing and extent of the easement upon its property. EDPL 204 (B) (2) requires only that the *approximate* location and the reasons for the location selection for the proposed project be set forth (*see Matter of Wechsler v New York State Dept. of Envtl. Conservation*, 76 NY2d 923, 927 [1990]; *Matter of Kaufmann's Carousel v City of Syracuse Indus. Dev. Agency*, 301 AD2d 292, 302 [2002], *lv denied* 99 NY2d 508 [2003]). Extreme accuracy is not required. At the public hearing, it was explained that "[t]he temporary easement interests are being sought primarily to allow for the structural stabilization of the subway tunnel during the construction." Only as the process unfolds will it be possible to determine precisely where the shaft walls must be stabilized to prevent a collapse. Given the complexity of the subway tunnel construction process and the nature of the subsurface easements, the Determination and Findings provide reasonable specificity as to the extent and duration of the easements.

Constitutional Issues

■ Two main constitutional issues are raised on this appeal: whether the rezoning plan constitutes an unconstitutional (1) regulatory taking because it renders the property incapable of producing a reasonable return, interferes with petitioners' investment-backed expectations regarding the property, and deprives petitioners of economically beneficial and productive use of the property for a period up to 10 years; or (2) "reverse spot zoning" because it singles out their property for a use clas-

sification different from that of the surrounding areas. We find that it does not.

Mercedes and 522 LLC's claim that the 10-year restriction diminishes the economic value of their property, thereby constituting an illegal regulatory taking, cannot be pursued in an EDPL 207 proceeding. The regulatory taking at issue arises in the context of a proposed condemnation and is not based on an isolated zoning regulation. Accordingly, New York's procedure for the pursuit of just compensation claims, EDPL 101 *et seq.*, fulfills all constitutional requirements (*see HBP Assoc. v Marsh*, 893 F Supp 271, 278 [1995]). Because there is an adequate mechanism to seek compensation, including an inverse condemnation claim (*see Niagara Frontier Bldg. Corp. v State of New York*, 33 AD2d 130, 133 [1969], *affd* 28 NY2d 755 [1971]), petitioners' recourse is limited to a plenary action, where the property owner must prove "beyond a reasonable doubt" that the land regulation has destroyed the economic value of the property (*de St. Aubin v Flacke*, 68 NY2d 66, 76 [1986]). Therefore, the purported regulatory taking is not a basis for rejecting the Determination and Findings.

■ As to petitioners' "reverse spot zoning" claim, the relevant inquiry in evaluating whether the subject zoning amendment withstands scrutiny under the Equal Protection Clause is whether there is a rational relationship between the phase 2 disparate treatment of petitioner property owners and a legitimate governmental purpose (*see Peck Slip Assoc. LLC v City Council of City of N.Y.*, 26 AD3d 209 [2006]). Reverse spot zoning is "a land-use decision which arbitrarily singles out a particular parcel for different, less favorable treatment than the neighboring ones" (*Penn Central Transp. Co. v New York City*, 438 US 104, 132 [1978]).

" 'Zoning legislation is tested not by whether it *defines* a well-considered plan, but by whether it *accords* with a well-considered plan for the community' " (*Matter of Gernatt Asphalt Prods.*, 87 NY2d at 684-685, quoting *Asian Ams. for Equality v Koch*, 72 NY2d 121, 131 [1988]). The essential purpose of this requirement is to "guard against ad hoc zoning legislation affecting the land of a few without proper regard to the needs or design of the community as a whole" (*id.* at 685). However, a municipality may change its zoning ordinance to promote the general welfare and to respond to changed conditions in the community so long as the change does not conflict "with the fundamental land use policies and development plans of the community" (*id.*).

The rezoning for creation of a midblock boulevard and park is, we find, "part of a well-considered and comprehensive plan calculated to serve the general welfare of the community" (*Henderson Taxpayers Assn. v Town of Henderson*, 283 AD2d 940, 941 [2001] [internal quotation marks omitted], *lv denied* 96 NY2d 719 [2001]). It will expand the limited amount of public open space in the Project area, create a continuous north-south pedestrian route from a large public square south of 33rd Street to a pedestrian bridge leading to 42nd Street and will permit a connection to the High Line open space to the south. It will also serve to distinguish the large scale commercial and entertainment uses along Eleventh Avenue from the lower density residential uses along Tenth Avenue.

Statutory Jurisdiction/Authority

Respondents' total condemnation of the Mercedes property, which consists of two garage structures, only a portion of which is depicted in the proposal, was reasonable. Respondents state that partial condemnation is not feasible where, as here, the very process used to demolish portions of the building could be expected to affect the stability of the remaining portions of the building. We see no basis for interfering with respondents' broad discretion in deciding the extent of the property necessary for the project (*see Matter of Gyrodyne Co. of Am., Inc. v State Univ. of N.Y. at Stony Brook*, 17 AD3d 675, 676 [2005], *lv denied* 5 NY3d 716 [2005]; *Matter of City of Mechanicville v Town of Halfmoon*, 23 AD3d 897, 899 [2005]).

We also reject petitioners' claim that the Determination and Findings constitute an ultra vires act because the City did not approve a taking for unspecified facilities in accordance with ULURP procedures (NY City Charter § 197-c [a] [1]). A reading of the Determination and Findings as a whole makes clear that the "other municipal facilities" mentioned are the Department of Sanitation garage and Police Department tow pound, the very uses the City approved under a separate ULURP application. Thus, the acquisition of Block 675 for a new recreation park, clearly authorized under ULURP, withstands constitutional scrutiny.

Public Use

Absent a clear showing of unreasonableness, courts have been reluctant to interfere with a condemning authority's determination that a particular site is needed for a public purpose (*Kelo v New London*, 545 US 469, —, 125 S Ct 2655, 2661 [2005]). In New York, the term "public use"

broadly encompasses any use, including urban renewal, which contributes to the health, safety and general welfare of the public (*see Matter of New York City Hous. Auth. v Muller*, 270 NY 333, 340 [1936]). Thus, our review is limited to ascertain whether the project is *rationally related* to a conceivable public purpose (*see Matter of West 41st St. Realty*, 298 AD2d at 6). We find that it is.

Contrary to the petitioners' contention, the Zoning Board was not required to analyze so-called cumulative impacts of the proposed project in connection with the development of Pier 76, a project unrelated to and outside the overall proposed plan (*see Matter of Settco, LLC v New York State Urban Dev. Corp.*, 305 AD2d 1026, 1027 [2003], *lv denied* 100 NY2d 508 [2003], citing, inter alia, *Matter of Long Is. Pine Barrens Socy. v Planning Bd. of Town of Brookhaven*, 80 NY2d 500, 513-515 [1992]; *see also Matter of North Fork Envtl. Council v Janoski*, 196 AD2d 590, 591 [1993]). The fact that Pier 76 may be the site of commercial development does not call into question the public purpose of the proposed plan (*see Matter of Murray v LaGuardia*, 291 NY 320, 329-330 [1943], *cert denied* 321 US 771 [1944]). Moreover, just because a private party somehow benefits from the condemnation of property to be used for a public purpose is an insufficient basis to reject a condemnation (*see Vitucci v New York City School Constr. Auth.*, 289 AD2d 479 [2001], *lv denied* 98 NY2d 609 [2002]; *Matter of Board of Coop. Educ. Servs. of Albany-Schoharie-Schenectady-Saratoga Counties v Town of Colonie*, 268 AD2d 838, 841 [2000]).

We have considered petitioners' remaining claims and reject them as having insufficient legal merit.

Accordingly, the petitions filed in this Court on or about November 2, 2005, pursuant to Eminent Domain Procedure Law § 207, challenging the resolution of respondents made after a hearing which approved a final generic environmental impact statement in connection with certain real property, should be denied, respondents' determinations confirmed, and the proceedings dismissed, without costs.

Motion seeking dismissal denied. Cross motions seeking leave to re-serve, to extend time to serve and for other related relief denied.

ANDRIAS, J.P., SAXE, FRIEDMAN and WILLIAMS, JJ., concur.

Petitions pursuant to Eminent Domain Procedure Law § 207, challenging the resolution of respondents made after a hearing

which approved a final generic environmental impact statement in connection with certain real property, denied, respondents' determinations confirmed and the proceedings dismissed, without costs.

Motion seeking dismissal denied. Cross motions seeking leave to re-serve, to extend time to serve and for other related relief denied.