[879 NYS2d 524]

In the Matter of DANIEL GOLDSTEIN et al., Petitioners, v NEW YORK STATE URBAN DEVELOPMENT CORPORATION, Doing Business as EMPIRE STATE DEVELOPMENT CORPORATION, Respondent.

Second Department, May 12, 2009

**APPEARANCES OF COUNSEL**

*Emery Celli Brinckerhoff & Abady LLP*, New York City (*Matthew D. Brinckerhoff* of counsel), and *John C. Gray, Jr.*, Brooklyn (*Jennifer Levy* of counsel), for petitioners (one brief filed).

*Berger & Webb, LLP*, New York City (*Charles S. Webb III* and *Kenneth J. Applebaum* of counsel), and *Bryan Cave LLP*, New York City (*Philip E. Karmel* of counsel), for respondent (one brief filed).

## OPINION OF THE COURT

ENG, J.

A 22-acre redevelopment project known as Atlantic Yards proposes to bring to Brooklyn a professional basketball team, thousands of new residential units, and millions of square feet of office space, revitalizing an area which had long been designated as blighted. The petitioners are a group of residents and business owners whose homes and businesses have been slated for condemnation in order to facilitate advancement of the project. Seeking redress in federal court, the petitioners unsuccessfully challenged the taking of their homes and businesses under the theory that the condemnation violated the Public Use Clause of the Fifth Amendment to the United States Constitution. The petitioners now bring this proceeding pursuant to EDPL 207, urging this Court to find that the New York Constitution imposes a more restrictive standard for the taking of private property than that imposed by the United States Constitution, and that the more restrictive standard has not been satisfied in this case. For the reasons which follow, we reject the petitioner's claim that the Public Use Clause of the New York Constitution must be read literally to allow the taking of private property only where that property is to be held open for common use by all members of the public. We find that, on the record in this case, the condemnation does not violate the Public Use Clause of the New York Constitution because it cannot be said that the public benefits which the Atlantic Yards project is expected to yield are incidental or pretextual in comparison to the benefit that will be bestowed upon the project's private developer. Accordingly, we confirm the determination to acquire the petitioners' properties by condemnation.

On December 11, 2003, the Forest City Ratner Companies (hereinafter Forest City) publicly announced a plan to redevelop a 22-acre area located south of Atlantic Avenue near downtown Brooklyn, which was later dubbed the Atlantic Yards Land Use Improvement and Civic Project (hereinafter Atlantic Yards). Approximately 40% of the proposed Atlantic Yards project site is occupied by the century-old Vanderbilt Rail Yard, owned by the Metropolitan Transportation Authority (hereinafter the MTA).

The Vanderbilt Rail Yard, which is situated below grade and surrounded by a 10-foot-high chain link fence, serves as an active storage and maintenance yard for Long Island Rail Road equipment and retired MTA buses.

At some point after it announced its plan to redevelop the area, Forest City sought the partnership of the New York State Urban Development Corporation, doing business as Empire State Development Corporation (hereinafter ESDC). ESDC is a public benefit corporation created by the State of New York to promote the growth and development of the State's municipalities by, among other things, undertaking public and private improvement programs to reinvigorate blighted and economically distressed areas (*see* McKinney's Uncons Laws of NY § 6252 [New York State Urban Development Corporation Act (Act) § 2, as added by L 1968, ch 174, § 1, as ammended]). To accomplish its mission, ESDC has been granted the authority to acquire property through the exercise of eminent domain (*see* McKinney's Uncons Laws of NY § 6263 [Act § 13]).

On February 18, 2005, Forest City and ESDC entered into two memoranda of understanding to jointly pursue the development and construction of the Atlantic Yards project. As envisioned by the General Project Plan subsequently adopted by ESDC, a cornerstone in the redevelopment of this area is the construction of a state-of-the-art, publicly-owned arena to serve as the home for the professional basketball team currently known as the New Jersey Nets, which is owned by Forest City's principal, Bruce Ratner. The arena is also intended to provide athletic facilities for colleges within the City of New York, and a venue for a variety of entertainment, educational, and civic events. In addition, the project provides for the construction of a new subway connection to accommodate visitors to the arena; the construction of a platform over and reconfiguration of the rail yard; the construction of 16 buildings which will include residential units, office space, retail space, and community facilities offering health care and child care services; and the creation of eight acres of publicly-accessible open space. The project is anticipated to create between 5,325 and 6,430 housing units, of which 2,250 are expected to be affordable for low- and middle-income families.

Prior to undertaking the development of the Atlantic Yards project, ESDC commissioned a blight study of the 22-acre project site, which encompasses approximately eight city blocks. The blight study, completed in July 2006, provided ESDC with

an overview of the physical and use characteristics of each block, detailed profiles of each lot contained on those blocks, and photographs of the exterior of the lots. The study noted that five of the blocks comprising the project site, or approximately 63%, were located within the boundaries of an area that has since 1968 been designated the Atlantic Terminal Urban Renewal Area (hereinafter the Renewal Area). The City mapped out this area for redevelopment more than 40 years ago because of substandard and unsanitary conditions, and has reaffirmed its designation as a blighted area as recently as 2004. Although the study noted that conditions in most of the Renewal Area, including the blocks immediately north of Atlantic Avenue, had greatly improved, it concluded that conditions in the portion of the Renewal Area south of Atlantic Avenue had yet to improve beyond the conditions that originally led the City to designate the area as blighted. The study attributed the lack of improved conditions in this portion of the project site to the presence of the open, below-grade rail yard which had created a gap in the urban landscape and discouraged street-level activity. The study further found that the rail yard had a blighting effect on adjacent blocks south of the rail yard, and that the non-rail-yard portion of the project site was characterized by substandard conditions, including vacant and underutilized buildings and vacant lots. According to the study, another principal reason why the entire project site had remained in a state of physical disrepair and had not experienced an upward swing in economic activity was that it had historically been held under the ownership of multiple parties, thus hindering the site assemblage necessary for redevelopment. Based upon the conclusions reached in the study, on July 18, 2006, ESDC adopted a resolution which, in accordance with the New York State Urban Development Corporation Act (McKinney's Uncons Laws of NY § 6251 *et seq.* [Act § 1 *et seq.*], L 1968, ch 174, as amended), included findings that the project site was a substandard or unsanitary area which tended to impair or arrest the sound growth and development of the municipality in which it is situated, and that the project consisted of a plan for the rehabilitation of the area.

Following a public hearing on December 8, 2006, ESDC issued its determination and findings in accordance with EDPL 204. In its determination, ESDC specified that the "public use, benefit and purpose of the project is to eliminate blighted conditions on the Project Site and the blighting influence of the below-grade [rail] [y]ard." ESDC further declared that the

project would serve the public purposes of providing recreational and community facilities, improvements to mass transit and infrastructure, affordable housing, job creation, and increased tax revenues for the City and State. In light of its finding that the planned redevelopment served a public use, benefit, or purpose, ESDC concluded that it should exercise its power of condemnation in order to implement the project.

Within 30 days after ESDC's determination, the petitioners, who live or own businesses in the portion of the project site which lies outside of the boundary of the designated Renewal Area, commenced an action (hereinafter the federal action) in the United States District Court for the Eastern District of New York, challenging the proposed taking of their properties. In the complaint in the federal action, the petitioners primarily asserted that the proposed condemnation of their properties violated the Public Use Clause of the Fifth Amendment to the United States Constitution since the government officials who had approved it were substantially motivated by a desire to confer a private benefit on Forest City's principal, Bruce Ratner, and that the public uses identified by ESDC were pretexts for a private taking. The petitioners also asserted a state-law claim under the EDPL. The United States District Court dismissed the claims under federal law for failure to state a claim upon which relief could be granted, and declined to exercise supplemental jurisdiction over the state-law claim (*see Goldstein v Pataki,* 488 F Supp 2d 254 [2007]). Accordingly, the petitioners' state-law claim was dismissed without prejudice (*id.* at 291). In concluding that the complaint in the federal action failed to state a viable claim that the condemnation violated the Fifth Amendment, the United States District Court pointed out that, by the petitioners' own admission, the project would serve several well-established public uses, including the remediation of blight, the construction of a sports arena, and the creation of new housing (*id.* at 286-287). The United States District Court further found that the allegations in the petitioners' federal complaint were insufficient to support a conclusion that the public purposes allegedly promoted or advanced by the project were mere pretexts to confer a private benefit on the private developer (*id.* at 291). The United States Court of Appeals for the Second Circuit (hereinafter the Second Circuit) affirmed the dismissal of the claims in the federal action, acknowledging the hardship that the exercise of eminent domain may have on individual property owners, but agreeing that the complaint failed

to state a Fifth Amendment claim (see *Goldstein v Pataki*, 516 F3d 50 [2008]).

Within six months after the Second Circuit affirmed the dismissal of the complaint in the federal action, the petitioners commenced this EDPL proceeding, asserting that the proposed taking of their properties is unlawful because it violates the Public Use Clause of NY Constitution, article I, § 7. The petitioners further allege that the project contravenes NY Constitution, article XVIII, § 6, because state funds are to be used to defray infrastructure costs associated with the construction of new housing units without restricting those housing units to use by low-income persons. The petitioners also maintain that the condemnation of their properties violates their due process and equal protection rights (see NY Const, art I, §§ 6, 11).

A threshold procedural issue which we must resolve before reaching the merits of the constitutional claims raised herein is whether the petition must be dismissed as untimely pursuant to EDPL 207 (A). This statute provides, in pertinent part, that persons aggrieved by a condemnor's determination "may seek judicial review thereof" in the appropriate judicial department of the Appellate Division "within thirty days after the condemnor's completion of its publication of its determination." It is undisputed that the petitioners asserted a state-law cause of action under the EDPL in the federal action within 30 days after publication of ESDC's determination, and thus this proceeding would have been timely had it been commenced at the time that the federal action was commenced. Furthermore, since the United States District Court declined to exercise jurisdiction over the supplemental state-law claim and dismissed it without prejudice, it is clear that the state-law claim was not adjudicated on the merits (see *Stylianou v Incorporated Vil. of Old Field*, 23 AD3d 454, 457 [2005]; *Denehy v St. John's Queens Hosp.*, 114 AD2d 991, 992 [1985]; see also *Van Hof v Town of Warwick*, 249 AD2d 382, 383 [1998]; *Travelers Indem. Co. v Sarkisian*, 139 AD2d 27, 29 [1988]). Under these circumstances, the petitioners would ordinarily be entitled to the benefit of CPLR 205 (a), a remedial statute which affords a litigant a six-month grace period within which to recommence an action which has been dismissed on grounds other than voluntary discontinuance, lack of personal jurisdiction, neglect to prosecute, or the entry of a final judgment on the merits (see *Stylianou v Incorporated Vil. of Old Field*, 23 AD3d at 457; *Denehy v St. John's Queens Hosp.*, 114 AD2d at 992).

■ However, the toll of CPLR 205 (a) does not apply when the statutory time bar to the commencement of an action operates as a condition precedent rather than as a statute of limitations (*see Yonkers Contr. Co. v Port Auth. Trans-Hudson Corp.,* 93 NY2d 375, 378 [1999]). The rationale for this distinction is that a statute of limitations suspends the remedy provided by a right of action, while a condition precedent conditions the very existence of a right of action, thus creating a substantive limitation (*see Yonkers Contr. Co. v Port Auth. Trans-Hudson Corp.,* 93 NY2d at 378). Stressing the legislative intent that challenges to a condemnation determination be brought expeditiously, ESDC urges us to find that the 30-day time period set forth in EDPL 207 (A) operates as a condition precedent, and that the six-month grace period of CPLR 205 (a) is thus unavailable to the petitioners. ESDC maintains that, by electing to challenge the constitutionality of the condemnation in federal court rather than immediately commencing an EDPL proceeding in state court, the petitioners in essence forfeited their right to seek review of their state-law claims. We disagree.

Although the Legislature's imposition of a 30-day time period within which to seek review of a condemnation determination reflects a general intent that challenges to such determinations be brought promptly, it does not automatically follow that EDPL 207 (A) operates as a condition precedent to judicial review. Bearing in mind that CPLR 205 (a) is a remedial statute intended to protect the rights of litigants who have given timely notice of their claims, the courts have extended its benefits to other types of proceedings in which judicial review must also be sought within a short period after the challenged determination is issued (*see Matter of Morris Invs. v Commissioner of Fin. of City of N.Y.,* 69 NY2d 933, 935 [1987]; *Matter of Mipor Assoc. v Board of Assessors of City of New Rochelle,* 262 AD2d 324 [1999]; *Matter of Winston v Freshwater Wetlands Appeals Bd.,* 224 AD2d 160 [1996]).

Furthermore, it is significant that there is nothing in the language of EDPL 207 (A) which expressly conditions the right to judicial review upon compliance with the statutory time limit (*see Campbell v City of New York,* 4 NY3d 200, 204 [2005]; *Matter of Morris Invs. v Commissioner of Fin. of City of N.Y.,* 69 NY2d at 936; *see also Hakala v Deutsche Bank AG,* 343 F3d 111, 116 [2003]). To the contrary, EDPL 207 (A) merely states that aggrieved persons may seek judicial review "within thirty days after the condemnor's completion of its publication of its

determination." This stands in marked contrast to McKinney's Unconsolidated Laws of NY § 7107 (L 1950, ch 301, § 7), the statute reviewed by the Court of Appeals in *Yonkers Contracting Co.*, which explicitly provides that an action to recover damages against the Port Authority of New York and New Jersey can go forward only "upon the *condition*" that it be commenced within one year (emphasis supplied). Guidance beyond the plain language of EDPL 207 (A) is also provided by the general principle that a statute operates as a condition precedent only where it both "creates a cause of action and attaches a time limit to its commencement" (*Romano v Romano,* 19 NY2d 444, 447 [1967]; *see Yonkers Contr. Co. v Port Auth. Trans-Hudson Corp.,* 93 NY2d at 379). In contrast, where "the cause was cognizable at common law or by other statute law, a statutory time limit is commonly taken as one of limitations" (*Romano v Romano,* 19 NY2d at 447; *see Matter of Village of Pelham v City of Mount Vernon,* 302 AD2d 397, 399 [2003]). Applying these principles here, we note that while the EDPL recodified the procedural law concerning the use of the power of eminent domain, and now provides "the exclusive procedure" governing acquisitions of property through condemnation (EDPL 101; *see* 1974 Rep of St Commn on Eminent Domain and Real Property Tax Assessment Rev, Comment to EDPL 104, at 13), it did not create a cause of action or any new substantive rights. Rather, all of the grounds for judicial review of a determination to condemn property set forth in EDPL 207 either relate to substantive rights arising from separate, preexisting sources, including the New York Constitution, or are procedural in nature. Accordingly, the 30-day time period for seeking judicial review is properly regarded as a procedural limitation on the remedy, rather than as a substantive limitation on the right of action (*see Scaffold-Russ Dilworth v Shared Mgt. Group,* 289 AD2d 932, 933-934 [2001]; *S & J Deli v New York Prop. Ins. Underwriting Assn.,* 119 AD2d 652 [1986]; *cf. Yonkers Contr. Co. v Port Auth. Trans-Hudson Corp.,* 93 NY2d 375 [1999]; *Tanges v Heidelberg N. Am.,* 93 NY2d 48 [1999]). We thus conclude that EDPL 207 (A) does not operate as a condition precedent, and that the petitioners should be afforded the benefit of CPLR 205 (a). Applying the CPLR 205 (a) toll, this proceeding, which is based upon the same transaction or occurrence as the federal action, and was commenced within six months after the date upon which the determination of the United States District Court in the federal action became final, is timely.

■ We also reject ESDC's contention that the dismissal of the petitioners' federal constitutional claims for failure to state a claim bars review of the state-law claims raised in the petition pursuant to the doctrine of collateral estoppel. The only issue before the federal courts was whether the petitioners were able to state a claim establishing an unconstitutional taking under the United States Constitution. The primary issue before this Court in an EDPL proceeding is whether there is a foundation in the administrative record for the determination to acquire property through condemnation (*see* EDPL 207; *Matter of 49 WB, LLC v Village of Haverstraw,* 44 AD3d 226, 236 [2007]). Since "collateral estoppel effect will only be given to matters 'actually litigated and determined' in a prior action" (*Kaufman v Eli Lilly & Co.,* 65 NY2d 449, 456 [1985]; *see also Gilberg v Barbieri,* 53 NY2d 285, 292 [1981]), the federal courts' determinations do not preclude the petitioners from obtaining a review of the administrative record and litigating their state-law claims here, as contemplated by this State's condemnation review scheme. Moreover, contrary to ESDC's contention, the federal courts did not make any discrete factual findings applicable to the state claims.

Turning to the merits, the petitioners contend that the Atlantic Yards project violates the Public Use Clause of NY Constitution, article I, § 7, for two main reasons. First, the petitioners assert that NY Constitution, article I, § 7 (a), which provides that "[p]rivate property shall not be taken for public use without just compensation," must be read restrictively to allow the State to exercise its eminent domain power only where the condemned property is to be held open for use by all members of the public. The petitioners maintain that a literal interpretation of the phrase "public use" is consistent with the intent of the framers of the New York Constitution, and that cases from the late nineteenth and early twentieth centuries decided closer in time to the adoption of the 1821 New York Constitution are necessarily more authoritative than modern case law. The petitioners assert that recent case law evaluating the constitutionality of condemnation determinations has become "infected" by federal jurisprudence, which more expansively interprets the Public Use Clause of the United States Constitution to permit takings that promote a "public purpose," such as economic development (*Kelo v New London,* 545 US 469, 480 [2005]).

As the petitioners point out, in the nineteenth and the early part of the twentieth centuries, the term "public use" was often

narrowly defined to include only those uses which were considered to be "for the benefit and advantage of all the public and in which all have a right to share [and] to freely enter upon under terms common to all" (*Bradley v Degnon Contr. Co.,* 224 NY 60, 71 [1918]; *see Matter of Mayor of City of N.Y.,* 135 NY 253, 259-260 [1892]). However, even under this formulation, the power of eminent domain was not limited to takings for free and common use by the public, such as the creation of parks and the construction of highways. Rather, the courts recognized quite early on that some takings, which would benefit private enterprises such as railroad companies, would also inure to the benefit of the public and thus constitute "public use." For example, in the 1837 case of *Bloodgood v Mohawk & Hudson R.R. Co.* (18 Wend 9, 77 [1837]), from which the petitioners quote the language of a dissenting Justice, the majority concluded that the Legislature had the constitutional power "to authorize the taking of private property for the purpose of making rail-roads or other public improvements of the like nature—whether such improvements be made by the state itself, or through the medium of a corporation or joint stock company." Moreover, in the 1892 case of *Matter of Mayor of City of N.Y.* (135 NY 253 [1892]), the Court of Appeals upheld the taking of privately-owned piers and wharves based upon a finding that it was necessary to ensure that large steamship lines had permanent piers for the loading and unloading of cargo in order to prevent business from being diverted to ports in New Jersey. The Court concluded that, even though some portion of the land taken might subsequently be leased by the City to private enterprises to carry out the business of loading and unloading cargoes and passengers, the land was nonetheless taken for public use.

In any event, even if the authority cited by the petitioners could be construed as limiting the exercise of the power of eminent domain to takings of land that would be open to use by the public, the Court of Appeals rejected this narrow interpretation more than 70 years ago in its 1936 decision in *Matter of New York City Hous. Auth. v Muller* (270 NY 333 [1936]). The issue before the Court in *Muller* was whether the New York City Housing Authority could properly exercise the power of eminent domain to acquire property for the construction of a public housing project. The *Muller* Court began its analysis of whether the proposed taking was proper by recognizing that the term "public use" was incapable of precise definition, and that

"public use" was an evolving concept which should not remain static with time. In this regard, the Court observed that

> "[o]ver many years and in a multitude of cases the courts have vainly attempted to define comprehensively the concept of a public use and to formulate a universal test. They have found here as elsewhere that to formulate anything ultimate, even though it were possible, would, in an inevitably changing world, be unwise if not futile. Lacking a controlling precedent, we deal with the question as it presents itself on the facts at the present point of time. 'The law of each age is ultimately what that age thinks should be the law' " (*id.* at 340, quoting *People ex rel. Durham Realty Corp. v La Fetra*, 230 NY 429, 450 [1921]).

Continuing its analysis, the *Muller* Court then expressly rejected the property owner's claim that the proposed use was private rather than public since the purpose of the taking was to provide apartments to low-income individuals. In reaching this conclusion, the Court expressly stated that "[u]se of a proposed structure, facility or service by everybody and anybody is one of the abandoned universal tests of a public use" (*Matter of New York City Hous. Auth. v Muller,* 270 NY at 342). The Court further stressed that the public benefit to be achieved by the taking was to protect and safeguard the entire public from the menace caused by the existence of slums. As *Muller* aptly illustrates, the literal interpretation of the concept of public use which the petitioners urge us to apply was abandoned long before the United States Supreme Court concluded, in its 2005 decision in *Kelo v New London* (545 US 469 [2005]), that the use of eminent domain to carry out an economic development plan does not violate the Fifth Amendment to the United States Constitution.

██ Further undercutting the petitioners' position is the fact that the more expansive formulation of "public use" recognized by the courts for many years was codified in 1977 when the EDPL was enacted to create a uniform procedure for the exercise of the power of eminent domain. In this regard, EDPL 207 expressly authorizes this Court, in reviewing a condemnation determination, to consider whether "a public use, benefit or purpose will be served by the proposed acquisition" (EDPL 207 [C] [4]). Thus, the petitioners' contention that the Public Use Clause of the New York Constitution permits property to be

acquired only where it will be held open for use by the public is wholly at odds with the very statutory authority which permits this Court to review ESDC's determination. Accordingly, we reject the petitioners' argument that the New York Constitution allows the taking of private property only for use by the public.

The petitioners alternatively contend that even if the term "public use" may be properly construed to include public benefit or purpose, the proposed condemnation of their properties is unlawful because it will not serve a public use even under this expanded definition. In support of this argument, the petitioners stress that their own properties are not blighted. The petitioners also argue that the public will not actually benefit from the takings since the promised benefits, including new jobs and affordable housing, may never be achieved.

"What qualifies as a 'public purpose' or 'public use' is broadly defined as encompassing virtually any project that may confer upon the public a benefit, utility, or advantage" (*Matter of 49 WB, LLC v Village of Haverstraw,* 44 AD3d at 235). In New York, these terms have been held to include any use, including urban renewal, which contributes to "the health, safety, general welfare, convenience or prosperity of the community" (*Greenwich Assoc. v Metropolitan Transp. Auth.,* 152 AD2d 216, 221 [1989]; *see Matter of Aspen Cr. Estates, Ltd. v Town of Brookhaven,* 47 AD3d 267, 274 [2007], *affd* 12 NY3d 735 [2009]; *Matter of C/S 12th Ave. LLC v City of New York,* 32 AD3d 1, 11 [2006]). A property owner seeking to challenge a condemnor's finding that a proposed acquisition will further a public use has the burden of establishing that the determination does not rationally relate to any conceivable public purpose (*see Matter of Waldo's, Inc. v Village of Johnson City,* 74 NY2d 718, 720 [1989]; *Matter of Aspen Cr. Estates, Ltd. v Town of Brookhaven,* 47 AD3d at 272; *Matter of 49 WB, LLC v Village of Haverstraw,* 44 AD3d at 236). "If an adequate basis for a determination is shown and the objector cannot show that the determination was without foundation, the agency's determination should be confirmed" (*Matter of Waldo's, Inc. v Village of Johnson City,* 74 NY2d at 720; *see Matter of Butler v Onondaga County Legislature,* 39 AD3d 1271, 1272 [2007]). Upon our review of the record, we find that the petitioners failed to sustain their burden of showing that the challenged determination is not rationally related to a legitimate public purpose.

It has long been recognized by the New York courts that where "land is found to be substandard, its taking for urban re-

newal is for a public purpose" (*Yonkers Community Dev. Agency v Morris,* 37 NY2d 478, 482 [1975]; *see Matter of Haberman v City of Long Beach,* 307 AD2d 313, 314 [2003], *cert dismissed* 543 US 1086 [2005]; *Matter of West 41st St. Realty v New York State Urban Dev. Corp.,* 298 AD2d 1, 6-7 [2002]; *Vitucci v New York City School Constr. Auth.,* 289 AD2d 479, 481 [2001]; *Sun Co. v City of Syracuse Indus. Dev. Agency,* 209 AD2d 34, 43 [1995]; *see also Berman v Parker,* 348 US 26 [1954]). Moreover, the taking of property in furtherance of urban renewal is not limited to the clearance of slums, as that term has been historically applied (*see Yonkers Community Dev. Agency v Morris,* 37 NY2d at 481).

Here, it is undisputed that over one half of the Atlantic Yards project site, including the Vanderbilt Rail Yard, lies within the bounds of the Renewal Area formally designated by the City as blighted and in need of development more than 40 years ago. ESDC found that the Renewal Area remains blighted, and that its condition has a blighting effect on the adjacent blocks containing the petitioners' properties, which are also characterized by substandard and unsanitary conditions. This finding was based upon the extensive 377-page blight study, which included photographs and profiles of each parcel within the eight-block project site, descriptions of all substandard and unsanitary conditions, and information regarding the present use of each parcel. The study concluded that 51 of the 73 parcels on the project site exhibited one or more blighted conditions, including numerous vacant lots and buildings, and that the area experienced higher than average crime rates. It further found that the project site, as a whole, was "vastly underutilized" due to the presence of the open rail yard and the diversity of ownership that hindered the site assemblage needed for redevelopment. This study, replete with empirical data, amply supports ESDC's finding that the project site is underdeveloped and characterized by unsanitary and substandard conditions, and thus provides an adequate foundation for its conclusion that the land is substandard (*see Matter of Jackson v New York State Urban Dev. Corp.,* 67 NY2d 400, 425 [1986]; *Yonkers Community Dev. Agency v Morris,* 37 NY2d at 486).

The project also serves the additional public purposes of creating an arena, publicly accessible open space, affordable housing, improvements to public transit, and new job opportunities (*see Yonkers Community Dev. Agency v Morris,* 37 NY2d at 482; *Murphy v Erie County,* 28 NY2d 80, 87 [1971]; *Matter of Dudley*

*v Town Bd. of Town of Prattsburgh,* 59 AD3d 1103 [2009]; *Matter of Rocky Point Realty, LLC v Town of Brookhaven,* 36 AD3d 708, 709 [2007]; *Matter of C/S 12th Ave. LLC v City of New York,* 32 AD3d at 9-10; *Vitucci v New York City School Constr. Auth.,* 289 AD2d at 481). The petitioners' argument that some of these public benefits may never actually be realized is conclusory and speculative.

In the alternative, the petitioners submit that even if the condemnation of their properties serves a public benefit, it nevertheless contravenes the New York Constitution because the public benefit to be conferred is merely incidental to the private benefit that will be realized by the developer Forest City and its principal, Bruce Ratner. As the petitioners contend, eminent domain cannot be used as a mere pretext for conferring benefits upon purely private entities and persons (*see Kelo v New London,* 545 US at 478; *Matter of 49 WB, LLC v Village of Haverstraw,* 44 AD3d at 238; *Matter of Woodfield Equities LLC v Incorporated Vil. of Patchogue,* 28 AD3d 488, 489 [2006]). For example, in *49 WB,* this Court found that the proposed condemnation of a building by the Village of Haverstraw was a mere pretext to assist its waterfront developer in meeting the developer's obligation to provide scattered-site, affordable housing units, and to reduce costs to the developer. In that case, the record demonstrated that the three stated public purposes to be achieved by the condemnation, including the provision of affordable housing units, were illusory. Indeed, there was evidence in the record there that the Village would achieve a greater number of affordable housing units by not condemning the property, and by allowing its private owner to proceed with an alternate plan to construct six to eight affordable rental units in the subject building. In contrast, while the petitioners in the instant proceeding question the true motivations of the public officials involved in the development of this project, they have offered no evidence that the public benefits which the project will allegedly promote or achieve are illusory, or that equivalent or greater public benefits would accrue absent the condemnation (*cf. Matter of 49 WB, LLC v Village of Haverstraw,* 44 AD3d at 240-243).

Furthermore, in light of the evidence in the record that much of the land to be acquired is substandard, and that the taking is rationally related to the purpose of remedying these substandard conditions, any incidental profit that may inure to Forest City from the remediation of the blighted project site does not

"undercut the public purpose of the condemnation of the substandard land" (*Yonkers Community Dev. Agency v Morris,* 37 NY2d at 482; *see Matter of Murray v LaGuardia,* 291 NY 320, 330 [1943]). It has long been recognized as a matter of state constitutional law that where the public good is expected to be enhanced by a project, "it does not matter that private interests [might] be benefited" (*Matter of Murray v LaGuardia,* 291 NY at 330). In any event, on the record presented here, it cannot be said that the project's public benefits are "incidental or pretextual in comparison with benefits to particular, favored private entities" (*Matter of Aspen Cr. Estates, Ltd. v Town of Brookhaven,* 12 NY3d 735, 736 [2009]). Accordingly, we reject the petitioners' contention that the proposed taking violates the New York Constitution because it will not serve a public use, purpose, or benefit.

The petitioners additionally allege that the project contravenes NY Constitution, article XVIII, § 6 (hereinafter section 6), because state funds are to be contributed toward infrastructure improvements which are necessary in part for the construction of new housing units, and that these new units will not be restricted for occupancy by persons of low income. New York Constitution article XVIII, which is entitled "Housing," was proposed at the 1938 New York Constitutional Convention and adopted by the citizens of this state to serve two distinct purposes—the provision of low-income housing, and the clearance and rehabilitation of substandard areas (*see Matter of Murray v LaGuardia,* 291 NY at 331). These separate purposes are articulated in the article's first section, which begins by stating that

> "[s]ubject to the provisions of this article, the legislature may provide in such manner, by such means and upon such terms and conditions as it may prescribe for low rent housing . . . for persons of low income as defined by law, or for the clearance, replanning, reconstruction and rehabilitation of substandard and insanitary areas, or for both such purposes" (NY Const, art XVIII, § 1).

Section 6, which is at issue in this case, further provides that "[n]o loan, or subsidy shall be made by the state to aid any project unless such project is in conformity with a plan or undertaking for the clearance, replanning and reconstruction or rehabilitation of a sub-standard and unsanitary area or areas." Section 6 then continues by restricting "[t]he occupancy of any such

project" to persons of low income. The petitioners maintain that the Atlantic Yards project comes within the ambit of section 6 because it contains a housing component. Thus, they assert that the provision of state funds for the construction of housing, without a concomitant restriction on occupancy of the new housing units to persons of low income, is unconstitutional. ESDC responds that the term "project," as used in section 6, encompasses only low-rent housing projects receiving state aid, and that the low-income housing restriction contained in the constitutional text is thus inapplicable to Atlantic Yards.

■ Although the term "project" is not defined by section 6, ESDC's contention that it applies only to low-income housing projects is supported by an examination of the structure of the relevant constitutional article and its stated objectives. The language of the New York Constitution must be given a reasonable interpretation, which comports not only with its letter, but with "its spirit and the general purposes of its enactment" (*Ginsberg v Purcell,* 51 NY2d 272, 276 [1980]; *see New York Pub. Interest Research Group v Steingut,* 40 NY2d 250, 258 [1976]; *Association for Protection of Adirondacks v MacDonald,* 253 NY 234, 238 [1930]). Reading the several provisions of New York Constitution article XVIII together, it is clear that rehabilitation of substandard land is a separate and distinct constitutional objective, which may be achieved through the exercise of eminent domain without the simultaneous construction of a public housing project restricted to low-income occupants (*see* NY Const, art XVIII, §§ 2, 3). To this end, the courts have upheld the use of eminent domain to rehabilitate blighted and substandard areas for a variety of purposes, including the construction of commercial office buildings (*see Matter of Jackson v New York State Urban Dev. Corp.,* 67 NY2d 400 [1986]). Affording section 6 a practical and reasonable construction, we conclude that it is only where the power of eminent domain is to be used to implement the separate purpose of providing low-income housing that state funding should be linked to the imposition of a restriction on occupancy to low-income persons. Since the core purpose of the Atlantic Yards project is to rehabilitate substandard land through improvements, including the construction of a sports arena, publicly-accessible open space, and community facilities, it cannot be deemed a housing project within the ambit of this state constitutional provision.

■ We further find that the petitioners' due process claim is without merit. ESDC substantially complied with the procedural

requirements of EDPL article 2 by conducting a public hearing, at which those in attendance were given "a reasonable opportunity to present an oral *or* written statement and to submit other documents concerning the proposed public project" (EDPL 203 [emphasis added]; *see Matter of Jackson v New York State Urban Dev. Corp.,* 67 NY2d at 418). Although not every interested person who attended the hearing had an opportunity to speak because of the large turnout, ESDC accepted written comments for more than one month after the close of the hearing, and additionally conducted two community forums to allow area residents to express their views. As the Court of Appeals has recognized, "nothing in article 2 of the EDPL requires a trial-type hearing" (*Matter of Jackson v New York State Urban Dev. Corp.,* 67 NY2d at 424), and "[t]he procedures outlined in the EDPL have been held to satisfy the due process requirements of the Federal and State Constitutions" (*Matter of Aspen Cr. Estates, Ltd. v Town of Brookhaven,* 47 AD3d at 273; *see Matter of Kaufmann's Carousel v City of Syracuse Indus. Dev. Agency,* 301 AD2d 292, 303 [2002]; *First Broadcasting Corp. v City of Syracuse,* 78 AD2d 490, 494 [1981]).

Finally, we conclude that the petitioners' equal protection claim must fail since there is no evidence in the record to support a finding that they have "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment" (*Village of Willowbrook v Olech,* 528 US 562, 564 [2000]; *see Matter of Gray v Town of Oppenheim,* 289 AD2d 743, 745 [2001]). In light of our conclusion that the proposed acquisition of the petitioners' properties comports with the Public Use Clause of NY Constitution, article I, § 7, and is not otherwise constitutionally infirm, there is no basis upon which to disturb ESDC's determination.

Accordingly, the determination is confirmed, the petition is denied, and the proceeding is dismissed on the merits.

SPOLZINO, J.P., FLORIO and MILLER, JJ., concur.

Adjudged that the determination is confirmed, without costs or disbursements, the petition is denied, and the proceeding is dismissed on the merits.